Filed 5/19/16

# IN THE SUPREME COURT OF CALIFORNIA

KATHLEEN A. WINN, et. al,       )
                                            )

        Plaintiffs and Appellants,   )

                                            )            S211793

        v.                          )

                                            )     Ct.App. 2/8 B237712

PIONEER MEDICAL GROUP, INC., et. al, )

                                            )     Los Angeles County

        Defendants and Respondents.  )   Super. Ct. No. BC455808

_____)

The Elder Abuse and Dependent Adult Civil Protection Act affords certain protections to elders and dependent adults. Section 15657 of the Welfare and Institutions Code provides heightened remedies to a plaintiff who can prove "by clear and convincing evidence that a defendant is liable for physical abuse as defined in Section 15610.63, or neglect as defined in Section 15610.57," and who can demonstrate that the defendant acted with "recklessness, oppression, fraud, or malice in the commission of [this] abuse." Section 15610.57, in turn, defines "neglect" in relevant part as "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (Welf. & Inst. Code § 15610.57, subd. (a)(1).)

1

We granted review to determine whether the definition of neglect under the Elder Abuse and Dependent Adult Civil Protection Act (Welf. & Inst. Code, § 15600 et seq.; the Elder Abuse Act or Act)[1] applies when a health care provider — delivering care on an outpatient basis — fails to refer an elder patient to a specialist. What we conclude is that the Act does not apply unless the defendant health care provider had a substantial caretaking or custodial relationship, involving ongoing responsibility for one or more basic needs, with the elder patient. It is the nature of the elder or dependent adult's relationship with the defendant — not the defendant's professional standing — that makes the defendant potentially liable for neglect. Because defendants did not have a caretaking or custodial relationship with the decedent, we find that plaintiffs cannot adequately allege neglect under the Elder Abuse Act.

## I.  BACKGROUND

This case involves the Court of Appeal's reversal of a trial court order sustaining defendants' demurrer. In considering whether that demurrer should have been sustained, we treat the demurrer as an admission by defendants of all material facts properly pled in plaintiffs' first amended complaint — but not logical inferences, contentions, or conclusions of fact or law. (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 6.)

Plaintiffs Kathleen A. Winn and Karen Bredahl allege the following facts. They are the daughters and surviving heirs of Elizabeth M. Cox. As early as November 2000, Mrs. Cox sought medical care on an outpatient basis at the facilities of Pioneer Medical Group, Inc. (Pioneer) and received treatment from Dr. Csepanyi, a medical doctor working at Pioneer and another named defendant.

[1]    All subsequent statutory references are to the Welfare and Institutions Code, unless otherwise noted.

2

In 2004, Dr. Lowe, a podiatrist and one of the named defendants in this case, treated Mrs. Cox for "painful onychomycosis," a condition that may limit mobility and impair peripheral circulation. Dr. Lowe recorded pulses that reflected impaired vascular flow in the lower legs, and sent a copy of his report to Dr. Csepanyi.

In January and February 2007, Mrs. Cox's lower extremity vascular symptoms worsened, and in February 2007, Dr. Csepanyi diagnosed Mrs. Cox with peripheral vascular disease. In December 2007, Dr. Lowe evaluated Mrs. Cox and found a reduced pulse in her extremities. He advised her to return for a follow-up visit in two months, but did not refer her to a vascular specialist. In February 2008, Dr. Lowe found an abscess and cellulitic changes, both of which are consistent with tissue damage resulting from vascular insufficiency. Dr. Lowe drained the infection, prescribed medication, and recommended another follow-up appointment, but again did not refer Mrs. Cox to a specialist.

When Dr. Csepanyi examined Mrs. Cox in July 2008, he found that she still suffered from peripheral vascular disease. He saw her a month later but did not perform a vascular examination. After suffering a laceration on her right foot in December 2008, Mrs. Cox sought treatment from Dr. Lee — another podiatrist at Pioneer — who prescribed antibiotics and instructed Mrs. Cox to return for follow-up treatment in January 2009. Mrs. Cox returned to Dr. Lee in January 2009, but the wound had not healed and Mrs. Cox saw Dr. Csepanyi later that month. She noted the wound was painful and Dr. Csepanyi recommended medication and foot soaks. The following month, Dr. Csepanyi diagnosed cellulitis of the toes, cyanosis, and a toe abscess, all of which point to cellular deterioration and tissue destruction from peripheral vascular ischemia.

Mrs. Cox saw Dr. Lowe four times in February and March 2009. Dr. Lowe noted that Mrs. Cox suffered from chronic nondecubitus ulcer of the toes, caused

by vascular compromise. He recommended topical cream and a special shoe, but did not refer Mrs. Cox to a specialist. During two visits, Dr. Lowe reported that he could not feel a pulse in Mrs. Cox's feet. On March 18, 2009, Mrs. Cox saw Dr. Csepanyi. Dr. Csepanyi noted that Mrs. Cox had suffered abnormal weight loss, but also failed to refer Mrs. Cox to a specialist.

The following day, Mrs. Cox was admitted to a hospital with symptoms consistent with ischemia and gangrene. She suffered from sepsis, or blood poisoning, which caused her foot to appear black, and doctors unsuccessfully attempted a revascularization procedure. In April of that year doctors amputated Mrs. Cox's right leg below the knee and in June doctors performed an above-the-knee amputation. In January 2010 Mrs. Cox was hospitalized for blood poisoning. She died several days later.

Plaintiffs filed a complaint alleging medical malpractice against defendants on March 19, 2010. Later, on February 23, 2011, plaintiffs filed a complaint for elder abuse, alleging that defendants consciously failed "to make a vascular referral." The trial court sustained defendants' demurrer based on plaintiffs' failure to sufficiently allege more than "mere negligence" and the "provision of inadequate care." In their first amended complaint, plaintiffs alleged again the conduct highlighted above.

Defendants again demurred. They also sought and obtained judicial notice of the March 2010 complaint plaintiffs had filed alleging medical malpractice. The trial court sustained defendants' demurrer to the first amended complaint without leave to amend. It concluded that plaintiffs had not offered facts sufficient to show that defendants had recklessly denied the needed care to Mrs. Cox, as would be necessary to show a violation of the Elder Abuse Act. Instead, the trial court concluded, plaintiffs' allegations again showed only professional negligence and "incompetence." Absent malice, oppression, or fraud, the trial court

4

determined, plaintiffs could not support a claim of neglect under the Act. The court ordered the complaint dismissed and plaintiffs appealed.

The Court of Appeal then reversed the trial court in a split opinion. It held that the Elder Abuse Act does not require the existence of a custodial relationship in order for the plaintiff to establish a cause of action for neglect.[2] The court also rejected defendants' contention that the trial court should determine, as a matter of law, whether defendants' conduct constituted professional negligence rather than neglect. The Court of Appeal distinguished two of our opinions interpreting the Act — *Delaney v. Baker* (1999) 20 Cal.4th 23 (*Delaney*) and *Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771 (*Covenant Care*) — and found that sections 15657, 15610.57, and 15657.2 did not impose any special relationship requirement.

Citing *Mack v. Soung* (2000) 80 Cal.App.4th 966 (*Mack*), the Court of Appeal concluded that the "statutory language simply does not support defendants' contention that only 'care custodians' are liable for elder abuse." And besides, the majority concluded, defendants here were in fact "care custodians." The majority likewise rejected defendants' claim that *Delaney* and *Covenant Care* suggested the Act's inapplicability to health care providers who have no custodial obligations, but instead "merely provide care." In dissent, Presiding Justice Bigelow criticized the majority as blurring the lines between Elder Abuse Act neglect and professional negligence. The dissent read *Delaney* as "reject[ing] the theory that a cause of action could be based on professional negligence within the

---

[2] The Court of Appeal further concluded that even if section 15610.57 requires a defendant to have a custodial relationship with the elder or dependent adult, defendants in the instant case were "care custodians." As discussed *post*, the Court of Appeal erred on both counts.

5

meaning of section 15657.2 and also constitute reckless neglect within the meaning of section 15657," and it focused on language in both *Delaney* and *Covenant Care* defining "neglect" as the failure to *provide* medical care. Examining the statutory language and the cases most on point, the dissent concluded that the "gravamen of plaintiffs' claim is one of professional negligence, not elder abuse."

We granted review to consider whether a claim of neglect under the Elder Abuse Act requires a caretaking or custodial relationship — where a person has assumed significant responsibility for attending to one or more of those basic needs of the elder or dependent adult that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance. Taking account of the statutory text, structure, and legislative history of the Elder Abuse Act, we conclude that it does.

## II. DISCUSSION

When legislators enacted the Elder Abuse Act, they enhanced the potential sanctions for neglect of elders or certain dependent adults. They did so by establishing heightened remedies — allowing not only for a plaintiff's recovery of attorney fees and costs, but also exemption from the damages limitations otherwise imposed by Code of Civil Procedure section 377.34. Unlike other actions brought by a decedent's personal representative or successor in interest, claims under the Act allow for the recovery of damages for predeath pain, suffering, and disfigurement. (Welf. & Inst. Code § 15657.) The question before us turns on the availability of these very remedies — a question that, in turn, depends on the presence of neglect under the Act, as defined in section 15610.57.

Our analysis begins with the text of this provision, as the statutory language is typically the best indication of the Legislature's purpose. (*Larkin v. Workers' Comp. Appeals Bd.* (2015) 62 Cal.4th 152, 157-158; see *Fitch v. Select Products*

6

*Co.* (2005) 36 Cal.4th 812, 818; *Baker v. Workers' Comp. Appeals Bd.* (2011) 52 Cal.4th 434, 442.) We consider the ordinary meaning of the statutory language, its relationship to the text of related provisions, terms used elsewhere in the statute, and the overarching structure of the statutory scheme. (*Larkin*, *supra*, 62 Cal.4th at pp. 157-158; *California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698; *Lonicki v. Sutter Health Central* (2008) 43 Cal.4th 201, 209; see also *Clean Air Constituency v. State Air Resources Bd.* (1974) 11 Cal.3d 801, 814; *People v. Rogers* (1971) 5 Cal.3d 129, 142 (conc. & dis. opn. of Mosk, J.) [in construing a statute, we do not look at each term as if "in a vacuum," but rather gather "the intent of the Legislature . . . from the statute taken as a whole"].) When the language of a statutory provision remains opaque after we consider its text, the statute's structure, and related statutory provisions, we may take account of extrinsic sources — such as legislative history — to assist us in discerning the Legislature's purpose. (*Holland v. Assessment Appeals Bd. No. 1* (2014) 58 Cal.4th 482, 490.)

The Elder Abuse Act's heightened remedies are available only in limited circumstances. A plaintiff must prove, by clear and convincing evidence, that a defendant is liable for either physical abuse under section 15610.63 or neglect under section 15610.57, and that the defendant committed the abuse with "recklessness, oppression, fraud, or malice." (§ 15657.) Section 15610.57, in turn, provides two definitions of neglect. First, "[t]he negligent failure of any person having the care or custody of an elder or a dependent adult to exercise that degree of care that a reasonable person in a like position would exercise." (§ 15610.57, subd. (a)(1).) Second, "[t]he negligent failure of an elder or dependent adult to exercise that degree of self care that a reasonable person in a like position would exercise." (*Id.*, subd. (a)(2).) Because plaintiffs allege neglect

7

arising in the context of medical care and not self-care, we deal only with section 15610.57's first definition of neglect.

Complementing these two definitions is the statute's explicitly nonexhaustive list of "neglect" examples. These include failures "to assist in personal hygiene" or to provide "food, clothing, or shelter" (§ 15610.57, subd. (b)(1)); "to provide medical care for physical and mental health needs" (*id.*, subd. (b)(2)); "to protect from health and safety hazards" (*id.*, subd. (b)(3)); and "to prevent malnutrition or dehydration" (*id.*, subd. (b)(4)).

What these provisions show is that neither section 15610.57, subdivision (a)(1) nor other relevant portions of the statute flatly preclude the statute's applicability to outpatient medical treatment. Instead, the statute simply refers explicitly to "any person having the care or custody of an elder." (§ 15610.57, subd. (a)(1).) As defendants contend, "care" and "custody" may sometimes be used as synonyms, (see Oxford Engl. Dict. Online (2016) <http://oed.com> [as of May 19, 2016] [defining "care" as "[c]harge" or "oversight with a view to protection, preservation, or guidance," and defining "custody" as "[s]afe keeping, protection, defence; *charge, care*, guardianship" italics added]), and defendants would construe "care" and "custody" as identical and synonymous. Plaintiffs' interpretation, in contrast, would construe "any person having the care or custody of" as "any person having *either* the care *or* the custody of" an elder or dependent adult.

To rebut this interpretation, defendants emphasize two textual elements of section 15610.57. First, they note the Legislature's decision to use the definite article "the" before "care or custody." From defendants' perspective, this definite article, used with the modifier "having," suggests that the Legislature sought to signal a distinction as to the relationship between someone who has been charged with "having" "the care" of an elder or dependent adult and someone who merely

8

provides care to a recipient. As defendants see it, had the Legislature not meant to signal a custodial relationship, it could have drafted section 15610.57 to apply to "any person caring for an elder or a dependent adult." Second, defendants argue that the Legislature's failure to use a definite article before the word "custody" suggests that we should read "care" and "custody" as "identical or synonymous." Plaintiffs, in turn, argue that the "or" in "care or custody" is an "*inclusive disjunctive conjunction* — that is, a conjunction that denotes separation or alternatives, while also allowing that both alternatives may be true."

These dueling textual and grammatical arguments may tell us something about the statute's scope, but neither interpretation fully answers a question implicit in the statute's use of the terms "having the care or custody": what kind of caretaking or custodial relationship is required to justify the conclusion that an individual or organization may be subjected to the Act's heightened remedies? Indeed, while defendants' interpretation is not categorically excluded by the statutory language, it not especially persuasive on its face, nor does the argument that the words "care" and "custody" should be read together as synonyms — even if it were availing — offer much insight into what those terms mean in the context of section 15610.57. The parties' dispute about whether "care or custody" should be taken individually or together does, however, highlight the fact that the text of section 15610.57, subdivision (a)(1) standing alone does not fully elucidate the scope of the relationship that the statute evokes by using these terms.

The content of section 15610.57, subdivision (b) nonetheless proves particularly instructive. Neglect includes the "[f]ailure to assist in personal hygiene, or in the provision of food, clothing, or shelter." (§ 15610.57, subd. (b)(1).) It also includes the "[f]ailure to protect from health and safety hazards" (*id.*, subd. (b)(3)), and the "[f]ailure to prevent malnutrition or dehydration" (*id.*, subd. (b)(4)). These examples add some context elucidating the statute's meaning

9

— context that supports inferences about the sort of conduct the Legislature sought to address from individuals "having the care or custody" of an elder. What they each seem to contemplate is the existence of a robust caretaking or custodial relationship — that is, a relationship where a certain party has assumed a significant measure of responsibility for attending to one or more of an elder's basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance.

One would not normally expect an able-bodied and fully competent adult to depend on another for "assist[ance] with personal hygiene" or "protect[ion] from health and safety hazards," any more than one would expect a party with only circumscribed, intermittent, or episodic engagement to be among those who "have . . . care or custody" of someone who may be particularly vulnerable. (§ 15610.57, subd. (b)(1), (3).). An individual might assume the responsibility for attending to an elder's basic needs in a variety of contexts and locations, including beyond the confines of a residential care facility. Certain in-home health care relationships, for example, may satisfy the caretaking or custodial relationship requirement set forth under the Act. Ultimately, the focus of the statutory language is on the nature and substance of the relationship between an individual and an elder or a dependent adult. This focus supports the conclusion that the distinctive relationship contemplated by the Act entails more than casual or limited interactions.

The remaining example of neglect — the "[f]ailure to provide medical care for physical and mental health needs" (§ 15610.57, subd. (b)(2)) — fits the pattern. As with the other examples of neglect, the failure to provide medical care assumes that the defendant is in a position to deprive an elder or a dependent adult of medical care. Section 15610.57, subdivision (b)(2)'s use of the word "provide" also suggests a care provider's assumption of a substantial caretaking or custodial

role, as it speaks to a determination made by one with control over an elder whether to *initiate* medical care at all. Read in tandem, section 15610.57, subdivisions (a)(1) and (b)(2) support a straightforward conclusion: whether a determination that medical care should be provided is made by a health care provider or not, it is the defendant's relationship with an elder or a dependent adult — not the defendant's professional standing or expertise — that makes the defendant potentially liable for neglect.

Section 15610.57, subdivision (b) is a case in point. By invoking failure to provide food or clothing, or neglect in providing mental health care, its provisions convey the broad range of conduct encompassed by the Elder Abuse Act's definition of neglect. What those examples nonetheless also suggest is that the statute was not meant to encompass every course of behavior that fits either legal or colloquial definitions of neglect. In construing statutes, we bear in mind that the scope of certain terms may sometimes be elucidated by related provisions. (See, e.g., *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 141 ["[I]f the Legislature intends a general word to be used in its unrestricted sense, it does not also offer as examples peculiar things or classes of things since those descriptions then would be surplusage."]; see also *Internat. Federation of Prof. & Technical Engineers, Local 21, AFL-CIO v. Superior Court* (2007) 42 Cal.4th 319, 341-342 [applying the principle of *ejusdem generis* to ascertain Legislature's intended purpose where a general term was followed by a nonexhaustive list of specific examples].) The examples of neglect in subdivision (b), though nonexhaustive, are nonetheless related terms that shed light on the type of conduct the Legislature sought to forestall — and on the conditions that could place an individual or organization in a position to commit "neglect" in the first place.

Contrast the examples from section 15610.57, subdivision (b) — and the underlying concept of neglect they imply — with the sort of conduct triggering

11

more conventional tort liability. A doctor's failure to prescribe the right medicine, or refer a patient to a specialist may give rise to tort liability even in the absence of a caretaking or custodial relationship. (See Code Civ. Proc., § 364 [defining professional negligence as the "negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death"]; see also *Fein v. Permanente Medical Group* (1985) 38 Cal.3d 137, 143-145, 151 [affirming medical malpractice judgment where defendants misdiagnosed plaintiff]; *Evans v. Ohanesian* (1974) 39 Cal.App.3d 121, 129 [failure to refer to specialist].) What seems beyond doubt is that the Legislature enacted a scheme distinguishing between — and decidedly not lumping together — claims of professional negligence and neglect. (See § 15657.2 ["Notwithstanding this article, any cause of action for injury or damage against a health care provider . . . based on the health care provider's alleged professional negligence, shall be governed by those laws which specifically apply to those professional negligence causes of action"]; see also *Covenant Care*, *supra*, 32 Cal.4th at p. 785.) The Act seems premised on the idea that certain situations place elders and dependent adults at heightened risk of harm, and heightened remedies relative to conventional tort remedies are appropriate as a consequence. (See *Delaney*, *supra*, 20 Cal.4th at pp. 36-37.) Blurring the distinction between neglect under the Act and conduct actionable under ordinary tort remedies — even in the absence of a care or custody relationship — risks undermining the Act's central premise. Accordingly, plaintiffs alleging professional negligence may seek certain tort remedies, though not the heightened remedies available under the Elder Abuse Act. (See, e.g., Code Civ. Proc., § 377.34 [generally limiting recovery of predeath pain and suffering damages].)

Aside from neglect situations, the only other circumstances where those heightened remedies are available under the Act must involve "physical abuse" as defined in section 15610.63. (See § 15676.) This, too, is consistent with the distinction between neglect and other forms of negligent conduct. Though the Act sets forth a rather broad definition of " 'abuse of an elder,' " including physical abuse, neglect, financial abuse, isolation, abandonment, and the deprivation by a care custodian of certain goods or services (§ 15610.07), section 15657 is explicitly limited to physical abuse and neglect. This qualification on the types of conduct that trigger heightened remedies supports the conclusion that the Legislature explicitly targeted heightened remedies to protect particularly vulnerable and reliant elders and dependent adults. Indeed, the limited availability of heightened remedies is indicative of a determination that individuals responsible for attending to the basic needs of elders and dependent adults that are unable to care for themselves should be subject to greater liability where those caretakers or custodians act with recklessness, oppression, fraud, or malice. (§ 15657.) The statutory scheme further persuades us that the concept of neglect — though broad enough to encompass settings beyond residential care facilities — is not intended to apply to any conceivable negligent conduct that might adversely impact an elder or dependent adult. Instead, neglect requires a caretaking or custodial relationship that arises where an elder or dependent adult depends on another for the provision of some or all of his or her fundamental needs.

Our reading of section 15610.57 also fits our conclusions in prior cases. *Delaney* concluded that " 'neglect' as defined in former section 15610.57 and used in section 15657 . . . [refers] to the failure of those responsible for attending to the basic needs and comforts of elderly or dependent adults, regardless of their professional standing, to carry out their custodial obligations." (*Delaney*, *supra*, 20 Cal.4th at p. 34; see *Covenant Care*, *supra*, 32 Cal.4th at p. 786.) In both

13

*Delaney* and in *Covenant Care*, the defendants had explicitly assumed responsibility for attending to the elders' most basic needs.  In *Delaney*, the elder resided at a skilled nursing facility where she had been left lying in her own urine and feces for extended periods of time because the defendants, upon whom she had relied to provide basic care, had failed to carry out their caretaking and custodial obligations.  (*Delaney*, 20 Cal.4th at p. 27.)  Similarly, in *Covenant Care*, we noted that the elder suffered "from Parkinson's disease and was unable to care for his personal needs."  (*Covenant Care*, 32 Cal.4th at p. 778.)  The elder in *Covenant Care* relied on the defendants to provide nutrition, hydration, and medication — needs that an able-bodied and fully competent adult would ordinarily be capable of handling on his or her own.  (See *ibid.*)  Our prior case law thus illustrates the type of caretaking or custodial relationship that the Act requires:  one where a party has accepted responsibility for attending to the basic needs of an elder or dependent adult.

Appearing not only in section 15610.57 but also elsewhere in the Act, the phrase "care or custody" evokes a bond that contrasts with a casual or temporally limited affiliation.  We generally presume that when the Legislature uses a word or phrase "in a particular sense in one part of a statute," the word or phrase should be understood to carry the same meaning when it arises elsewhere in that statutory scheme.  (*People v. Dillon* (1983) 34 Cal.3d 441, 468.)  Section 15610.05 defines " 'abandonment,' " for example, as the "desertion or willful forsaking of an elder or a dependent adult by anyone having care or custody of that person" where a reasonable person "would continue to provide care and custody."  (§ 15610.05.)  It is difficult to imagine under what circumstances an individual could "abandon" an elder or dependent adult absent the existence of a caretaking or custodial relationship (e.g., a degree of dependence and reliance that would make abandonment possible).  Similarly, section 15656, which imposes fines and jail

14

time for subjecting an elder to great bodily harm or death, defines " 'caretaker' " as it is used in that section as a "person who has the care, custody, or control of . . . an elder or a dependent adult." (§ 15656, subd. (d).) Here again, the terms "care" and "custody" are used together, and are best understood to denote a distinctive caretaking or custodial relationship.

It is this reading of the Act that most readily fits with how we have interpreted analogous statutory provisions arising beyond the Act that nonetheless use the phrase "having the care or custody." We construe this phrase in context, with the understanding that statutes "relating to the same subject must be harmonized, both internally and with each other, to the extent possible." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387; see *Lexin v. Superior Court* (2010) 47 Cal.4th 1050, 1090-1091 ["It is a basic canon of statutory construction that statutes in pari materia should be construed together so that all parts of the statutory scheme are given effect"].) For example, Penal Code section 368 imposes criminal liability upon any person "having the care or custody of any elder or dependent adult" who "willfully causes or permits" the elder or dependent adult to be injured or endangered.[3] In *People v. Heitzman* (1994) 9

---

[3] Penal Code section 368, subdivision (b)(1) provides: "Any person who knows or reasonably should know that a person is an elder or dependent adult and who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any elder or dependent adult, willfully causes or permits the person or health of the elder or dependent adult to be injured, or willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health is endangered, is punishable by imprisonment in a county jail not exceeding one year, or by a fine not to exceed six thousand dollars ($6,000), or by both that fine and imprisonment, or by imprisonment in the state prison for two, three, or four years."

15

Cal.4th 189, 204 (*Heitzman*), we considered the scope of Penal Code section 368, and noted that the statutory language was "derive[d] verbatim from the felony child abuse statute." Analyzing the statutory language and legislative history, we concluded that the underlying purpose of both felony abuse statutes was to "protect the members of a vulnerable class from abusive situations," which usually arose where caretakers or custodians responsible for the basic needs of these vulnerable, dependent populations failed to provide for their charges. (*Heitzman*, at p. 203.) Though section 15610.57 defines neglect for civil liability purposes, the statutory language invokes a similar caretaking or custodial relationship requirement.

What the text of section 15610.57 conveys about the Legislature's purpose here — along with related provisions, and similar language in other statutes — supports tethering the concept of neglect to caretaking or custodial situations. But the legislative history of the Act likewise suggests that the Legislature was principally concerned with particular caretaking and custodial relationships, and the abuse and neglect that can occur in that context. First, the legislative declarations accompanying the Elder Abuse Act tend to reinforce a reading of section 15610.57 that imposes a caretaking or custodial prerequisite. The Legislature recognized "that most elders . . . who are at the greatest risk of abuse, neglect, or abandonment by their families or caretakers suffer physical impairments and other poor health that place them in a *dependent and vulnerable position*." (§ 15600, subd. (d), italics added.) The Legislature took note of the "factors which contribute to abuse, neglect, or abandonment of elders and dependent adults [such as] economic instability of the family, resentment of caretaker responsibilities, stress on the caretaker, and abuse by the caretaker of drugs or alcohol." (*Id.*, subd. (e).) As these declarations make clear, the Legislature expressed concern for those who are vulnerable and dependent on

16

others for their most basic needs. And the Legislature recognized certain factors that might arise in a custodial setting — emphasizing abuse and neglect by caretakers — in highlighting its rationale for the Act's passage.

Second, the legislative history tends to support the view that the Legislature enacted section 15657 in large part to combat pervasive abuse and neglect in certain health care facilities. (*Delaney*, *supra*, 20 Cal.4th at pp. 35-36.) As we concluded in *Delaney*, "one of the major objectives of this legislation was the protection of residents of nursing homes and other health care facilities." (*Id.* at pp. 36-37.) That recognition led us to hold as "contrary" to the Legislature's objective the exemption of nursing homes and other similar facilities from section 15657's reach. (*Delaney*, at p. 37.)

Third, nothing in the legislative history suggests that the Legislature intended the Act to apply *whenever* a doctor treats any elderly patient. Reading the act in such a manner would radically transform medical malpractice liability relative to the existing scheme. Senate Bill No. 679 [1991-1992 Reg. Sess.] was the bill that contained the Act. No portion of its legislative history contains any indication that the Legislature's purpose was to effectuate such a transformation of medical malpractice liability. (See *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158, 1169 [discussing "the *absence* of legislative history" in concluding that amendment described as " 'technical and conforming' " was not intended to effect a substantial change in the law]; *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 597 ["the *absence* of legislative history [can] be of significance in deciphering legislative intent" (citing *Lodge at Torrey Pines*, at p. 1169)].) While the absence of legislative history alone is of limited significance, here we see only evidence that cuts against any argument that the Legislature was not aware of the scope of health care providers' potential liability under the Act. (See *Delaney*, *supra*, 20 Cal.4th at p. 41 [noting that § 15657's

17

"legislative history suggests that nursing homes and other health care providers were among the primary targets of the Elder Abuse Act"]; see also section 15657.2 [distinguishing claims "based on the health care provider's alleged professional negligence" from those governed by the Elder Abuse Act].)

Moreover, finding a caretaking or custodial relationship prerequisite is also consistent with our prior case law, and the Court of Appeal's reliance on *Mack, supra,* 80 Cal.App.4th 966, in holding to the contrary is unpersuasive. The defendant doctor in *Mack* assumed a caretaking relationship with a reliant, vulnerable patient who was unable to access other health care providers — indeed, the defendant actively prevented the patient from being hospitalized and failed to provide any medical care. (*Ibid.* ["When her condition worsened . . . Dr. Soung abruptly abandoned [decedent] as her physician without further notice"].) In resolving the dispute arising from these facts, the *Mack* court ignored a key limiting factor in *Delaney* — the presence of a custodial relationship. Moreover, as *Mack* predated *Covenant Care*, the *Mack* court did not have the benefit of our clear pronouncement on the Act's caretaking or custodial prerequisite. (See *Covenant Care*, *supra*, 32 Cal.4th at p. 786 ["[C]laims under the Elder Abuse Act are not brought against health care providers *in their capacity as providers* but, rather, against *custodians and caregivers* that abuse elders and that may or may not, incidentally, also be health care providers"].) Accordingly, we disapprove of *Mack v. Soung*, *supra*, 80 Cal.App.4th 966, to the extent it finds claims of neglect under the Elder Abuse Act may be brought irrespective of a doctor's caretaking or custodial relationship with an elder patient.

18

In the alternative, plaintiffs contend that if neglect under section 15610.57, subdivision (a)(1), requires a caretaking or custodial relationship,[4] then defendants assumed "custody" of Mrs. Cox by treating her at Pioneer's outpatient facilities. According to plaintiffs, section 15610.17's definition of a care custodian under the Act includes clinics, Pioneer's outpatient facilities are clinics, and Pioneer is therefore a care custodian. This argument also fails to persuade. What plaintiffs erroneously assume is that the Act's definition of care custodian in section 15610.17 will, as a matter of law, always satisfy the particular caretaking or custodial relationship required to show neglect under section 15610.57. While it may be the case that many of the " 'care custodian[s]' " defined under section 15610.17 could have "the care or custody of" an elder or a dependent adult as required under section 15610.57, plainly the statute requires a separate analysis to determine whether such a relationship exists. Neither the text of section 15610.17 nor anything else in the statute supports plaintiffs' argument that the presence of such a relationship may be assumed whenever the definition of "care custodian" is met.

Section 15610.17 broadly defines a care custodian as an "administrator or an employee of any of the following public or private facilities or agencies, or persons providing care or services for elders or dependent adults, including members of the support staff and maintenance staff." (§ 15610.17.) It then lists a variety of public and private agencies and facilities, from "[t]wenty-four-hour

---

[4]     Amicus curiae California Advocates for Nursing Home Reform contends that Senate Bill No. 1681 [1993-1994 Reg. Sess.], which enacted section 15610.17, "has nothing to do with the [Elder Abuse] Act." We disagree, and we interpret provisions added by later legislation "to preserve statutory harmony and effectuate the intent of the Legislature." (*McLaughlin v. State Bd. of Education* (1999) 75 Cal.App.4th 196, 219-220.)

health facilities" (§ 15610.17, subd. (a)), to "[h]umane societies and animal control agencies" (§ 15610.17, subd. (v)). The list concludes with a catchall provision for "[a]ny other . . . person providing health services or social services to elders or dependent adults." (*Bernard v. Foley* (2006), 39 Cal.4th 794, 807 [describing § 15610.17, subd. (y) as a "broad catchall provision"].) While one might reasonably conclude that a 24-hour health facility (§ 15610.17, subd. (a)), or a residential care facility for the elderly (§ 15610.17, subd. (j)), could have "the care or custody" of an elder or dependent adult, it is less evident why fire departments (§ 15610.17, subd. (w)), animal control agencies (§ 15610.17, subd. (v)), or offices of environmental health and building code enforcement (§ 15610.17, subd. (x)), would necessarily have the type of caretaking or custodial relationship with an elder or a dependent adult required to show neglect under section 15610.57.

Beyond the assertion that defendants treated Mrs. Cox at outpatient "clinics" operated by defendants, plaintiffs offer no other explanation for why defendants' intermittent, outpatient medical treatment forged a caretaking or custodial relationship between Mrs. Cox and defendants. No allegations in the complaint support an inference that Mrs. Cox relied on defendants in any way distinct from an able-bodied and fully competent adult's reliance on the advice and care of his or her medical providers. Accordingly, we hold that defendants lacked the needed caretaking or custodial relationship with the decedent.

### III. CONCLUSION

Plaintiffs cannot bring a claim of neglect under the Elder Abuse Act unless the defendant health care provider has a caretaking or custodial relationship with the elder or dependent adult. Here, plaintiffs rely solely on defendants' allegedly substandard provision of medical treatment, on an outpatient basis, to an elder. But without more, such an allegation does not support the conclusion that neglect occurred under the Elder Abuse Act. To elide the distinction between neglect under the Act and objectionable conduct triggering conventional tort remedies — even in the absence of a care or custody relationship — risks undermining the Act's central premise. Our conclusion is grounded in the text of sections 15657 and 15610.57 and related provisions, the extent to which those provisions make heightened remedies available only in specific circumstances, the applicable legislative history, and the light these shed on the Legislature's intended purpose. Our conclusion that a claim of neglect under the Elder Abuse Act depends on the existence of a caretaking or custodial relationship is also consistent with our prior cases.

Accordingly, we reverse the Court of Appeal and remand to that court for further proceedings consistent with our opinion.

**CUÉLLAR, J.**


**WE CONCUR:**

**CANTIL-SAKAUYE, C. J.**
**WERDEGAR, J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**

21

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Winn v. Pioneer Medical Group, Inc.

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 216 Cal.App.4th 875
**Rehearing Granted**

_____

**Opinion No.** S211793
**Date Filed:** May 19, 2016

_____

**Court:** Superior
**County:** Los Angeles
**Judge:** Joanne B. O'Donnell

_____

**Counsel:**

Magaña, Cathcart & McCarthy and Clay Robbins III for Plaintiffs and Appellants.

Balisok & Associates and Russell S. Balisok for California Advocates for Nursing Home Reform, Inc., as Amicus Curiae on behalf of Plaintiffs and Appellants.

Evans Law Firm, Ingrid Evans and Elliot Wong for Consumer Attorneys of California as Amicus Curiae on behalf of Plaintiffs and Appellants.

Cole Pedroza, Curtis A. Cole, Kenneth R. Pedroza, Matthew S. Levinson, Cassidy C. Davenport; Carroll, Kelly, Trotter, Franzen & McKenna, Carroll, Kelly, Trotter, Franzen, McKenna & Peabody, Richard D. Carroll, David P. Pruett and Jennifer A. Cooney for Defendants and Respondents.

Tucker Ellis, E. Todd Chayet and Rebecca A. Lefler for California Medical Association, California Dental Association, California Hospital Association and American Medical Association as Amici Curiae on behalf of Defendants and Respondents.

Manatt, Phelps & Phillips and Harry W.R. Chamberlain II for Association of Southern California Defense Counsel as Amicus Curiae on behalf of Defendants and Respondents.

Fred J. Hiestand for The Civil Justice Association of California as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Clay Robbins III
Magaña, Cathcart & McCarthy
1900 Avenue of the Stars, Suite 650
Los Angeles, CA  90067-5899
(310) 553-6630

Russell S. Balisok
Balisok & Associates
330 N. Brand Boulevard, Suite 702
Glendale, CA  91203
(818) 550-7890

Kenneth R. Pedroza
Cole Pedroza
200 S. Los Robles Avenue, Suite 300
Pasadena, CA  91101
(626) 431-2787