Filed 8/8/25

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE


| | |
|---|---|
| JAMES FRANKLAND et al., | B338370 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. 23STCV09176) |
| v. | |
| SIAMAK ETEHAD, | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of Los Angeles County, William F. Fahey, Judge. Affirmed.

Allen Saltzman, Tom M. Allen and Erica L. Saltzman for Plaintiffs and Appellants.

Cole Pedroza, Kenneth R. Pedroza, Matthew S. Levinson; Kjar McKenna & Stockalper and Robert L. McKenna III for Defendant and Respondent.

* * * * * *

The Elder Abuse and Dependent Adult Civil Protection Act
(the Act) (Welf. & Inst. Code, § 15600 et seq.)[1] authorizes elders
(that is, persons 65 and older (§ 15610.27)) who suffered "neglect"
or "financial abuse" at the hands of persons acting with
"recklessness, oppression, fraud, or malice" to obtain "heightened
remedies" in a civil suit for damages. (§§ 15657, 15657.5,
15610.30, 15610.57, subd. (a)(1); *Delaney v. Baker* (1999) 20
Cal.4th 23, 27 (*Delaney*).) The Act explicitly excludes from its
reach an elder's claim "for injury or damage against a health care
provider . . . based on th[at] provider's alleged professional
negligence." (§ 15657.2; *Delaney*, at p. 29; *Covenant Care, Inc. v.
Superior Court* (2004) 32 Cal.4th 771, 781 (*Covenant Care*).)
Does an elder state a claim under the Act for "neglect" or
"financial abuse" against a physician based solely on that
physician's negligent medical services while the elder resided at a
skilled nursing facility? We hold the answer is "no." The Act
limits "neglect" to "[t]he negligent failure of any person having
*the care or custody of any elder* . . ." (§ 15610.57, subd. (a)(1),
italics added), and a physician's conduct in providing negligent
medical services to an elder residing at a skilled nursing facility
does not—without more—constitute "neglect" because that
physician lacks the requisite "robust caretaking or custodial
relationship" with the elder (*Winn v. Pioneer Medical Group, Inc.*
(2016) 63 Cal.4th 148, 158 (*Winn*)) and is accordingly being sued
for no more than his professional negligence (which, as noted
above, falls outside the Act). Along similar lines, where, as here,
the alleged financial abuse flows inexorably from the alleged

---

1      All further statutory references are to the Welfare and
Institutions Code unless otherwise indicated.

2

professional negligence, such abuse is indistinguishable from that negligence and also falls outside the Act. We accordingly affirm the trial court's judgment for the physician in this case after sustaining a demurrer to the neglect and financial abuse claims under the Act.

## FACTS AND PROCEDURAL BACKGROUND

### I.  Facts[2]

On July 17, 2021, James Frankland (James)[3] was admitted to Casitas Care Center, a 99-bed licensed skilled nursing facility in Granada Hills, California.[4]  At that time, James was 75 years old and presented "significant professional and custodial needs" due to the numerous conditions from which he suffered, which included cerebral palsy, dysphasia, encephalopathy, anemia, and hypertension.  James also "required extensive assistance" with and was "dependent" upon Casitas Care Center for bed mobility, dressing, feeding through a G-tube, toileting, and bathing.

Siamak Etehad, M.D. (Dr. Etehad) provided "in-facility resident care" to James at Casitas Care Center.  In that capacity, Dr. Etehad was responsible for (1) evaluating James and making orders for his care and treatment, (2) diagnosing James's medical conditions, (3) determining and issuing appropriate orders for his

---

[2]  We draw these facts from the allegations in the operative complaint.

[3]  We refer to the decedent as "James" to avoid confusion because multiple Frankland family members are discussed in this opinion.  We mean no disrespect.

[4]  James was a resident of Casitas Care Center at earlier points in time, but the care he received at those other times is not relevant to the claims at issue here.

care and treatment, and (4) writing and signing orders in James's health records.[5] Dr. Etehad discharged some of his medical duties in an unobjectionable manner, such as purporting to order a urinalysis test at James's family's request in August 2021, conducting an annual physical examination of James on August 28, 2021, and making dietary orders for James. However, Dr. Etehad fell short in other respects. Specifically:

— Dr. Etehad's examinations and evaluations of James were "perfunctory";

— Although Dr. Etehad ordered the staff at Casitas Care Center to perform a urinalysis, the test was never ordered and Dr. Etehad failed to follow up on his order;

— In his chart notes, Dr. Etehad falsely checked the box indicating that he reviewed James's lab results at various appointments, when there were no results to review;

— Dr. Etehad failed to provide care to James's bedsore and self-mutilation bodily injuries;

— Dr. Etehad diagnosed James with sepsis and pneumonia at an October 2, 2021 examination, but did not change James's care plan, did not order prophylactic antibiotics, and did not order lab tests until a week later;

— Dr. Etehad failed to evaluate James's dehydration and loss of 27 pounds over a five-day period in October 2021; and

— Dr. Etehad's handwriting was "illegible" and "indecipherable," which caused his "assessments, diagnoses, and

---

[5]     Contrary to what was represented at oral argument, the complaint alleges that Casitas—not Dr. Etehad—dictated James's diet, and that Dr. Etehad was not James's exclusive healthcare provider.

orders" to not be "properly and adequately interpreted or applied to the care" James needed at Casitas Care Center.

By October 10, 2021, James "was in crisis" and was transferred to Providence Holy Cross Medical Center.

James died on February 8, 2022.

## II. Procedural Background

On April 25, 2023, James's brother, Steven Frankland (plaintiff), filed a complaint in his capacity as James's successor in interest, in his individual capacity, and on behalf of James's heirs.[6] The complaint alleges claims against Casitas Care Center[7] and Dr. Etehad for (1) "neglect," under the Act, (2) "financial abuse," under the Act, (3) negligence, and (4) wrongful death.[8] In support of the neglect claim, plaintiff alleges that Dr. Etehad and Casitas Care Center "had direct care or custody" of James and "failed to exercise the degree of care reasonable persons in a like position would exercise by denying or withholding services necessary to meet [James's] basic needs." In support of the financial abuse claim, plaintiff alleges that Dr. Etehad and Casitas Care Center's neglectfully-provided medical services resulted in higher charges to Medicare (and the potential

---

[6] James's other brother, Walter Frankland, elected to not be named and instead to have his rights represented by plaintiff; he accordingly was named in the complaint as a nominal defendant.

[7] The lawsuit also named KF Casitas, LLC, which is the owner and operator of Casitas Care Center, and Cambridge Healthcare Services, LLC, which exercises "upper management" control over Casitas Care Center.

[8] The complaint also alleges a cause of action against Casitas Care Center and KF Casitas, LLC for violations of James's resident's rights.

for Medicare to obtain a larger lien against any recovery in this lawsuit).

Plaintiff settled with every defendant except Dr. Etehad.

Dr. Etehad then filed a demurrer in December 2023 to plaintiff's two claims under the Act. As pertinent here, Dr. Etehad argued that plaintiff's claims failed because (1) Dr. Etehad lacked a caretaking or custodial relationship with James, as required for the neglect claim, and (2) Medicare payments are not a property right belonging to James, as required for the financial abuse claim. Following further briefing and a hearing, the trial court issued an order sustaining the demurrer without leave to amend.[9] The court concluded that plaintiff did not state a claim for neglect under the Act because the complaint, "[s]tripped to its essence," alleged no more than "medical negligence" by Dr. Etehad. The court further concluded that plaintiff did not state a claim for financial abuse under the Act because plaintiff's allegations, if accepted, "would essentially result in all California doctors being exposed to financial elder abuse liability in cases of alleged medical negligence," which is a "sweeping expansion" of the Act that can only be accomplished by "legislative action, if at all." The court denied plaintiff leave to amend the complaint given his counsel's statement at the hearing that counsel had already "put into [the] complaint[] each and

---

[9] Dr. Etehad also filed a motion to strike the allegations in the complaint pertaining to plaintiff's requests for punitive damages and attorney fees under the Act. The trial court granted that motion in light of its ruling on the demurrer. Because plaintiff does not challenge that specific order on appeal, we do not discuss the motion further.

6

every fact available and that he had no additional facts to allege in this case."

Following the parties' stipulation to enter judgment for Dr. Etehad on plaintiff's remaining claims for negligence and wrongful death, plaintiff timely filed this appeal.[10]

## DISCUSSION

Plaintiff argues that the trial court erred in sustaining the demurrer because he has stated viable claims for neglect and financial abuse under the Act.

In reviewing a trial court's dismissal of claims on demurrer, "'we ask two questions:  (1) Was the demurrer properly sustained; and (2) Was leave to amend properly denied?'" (*Engel v. Pech* (2023) 95 Cal.App.5th 1227, 1234-1235.)  In answering the first question, we ask whether the operative compliant "'"'states facts sufficient to constitute a cause of action'"'" against the specific demurring defendant.  (*Id.* at p. 1235; *Brinsmead v. Elk Grove Unified School Dist.* (2023) 95 Cal.App.5th 583, 587; *Carter v. Prime Healthcare Paradise Valley LLC* (2011) 198 Cal.App.4th 396, 410 (*Carter*); Code Civ. Proc., § 430.10, subd. (e).)  In undertaking that inquiry, we accept as true all material facts properly pleaded in the operative complaint and liberally construe the complaint's allegations, but do not assume the truth of allegations amounting to conclusions of law.  (*Engel*, at p. 1235;

---

10    While a stipulated judgment is generally not appealable, this case falls within the "'well-established'" exception that a party may appeal from a stipulated judgment when "'"consent was merely given to facilitate an appeal following adverse determination of a critical issue."'" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 400; *Simple Avo Paradise Ranch, LLC v. Southern California Edison Co.* (2024) 102 Cal.App.5th 281, 292-294.)

7

*Brinsmead*, at p. 587; *Salazar v. Walmart, Inc.* (2022) 83 Cal.App.5th 561, 566.) And where, as here, the challenged claims are statutory, the material facts supporting the claims must be alleged with particularity. (*Intrieri v. Superior Court* (2004) 117 Cal.App.4th 72, 82 (*Intrieri*); *Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 223 (*Alexander*); *Carter*, at p. 407.) In answering the second question, we ask whether there is a reasonable possibility that the defect in the complaint can be cured by amendment. (*Engel*, at p. 1235.) We review the trial court's ruling regarding the first question de novo,[11] and review its ruling regarding the second question for an abuse of discretion. (*Ibid.*; *Lee v. Hanley* (2015) 61 Cal.4th 1225, 1230; *Piedmont Capital*, at p. 967.)

## I. Was the Demurrer Properly Sustained?

### A. *Pertinent law*

Although originally establishing reporting requirements for the abuse of elders[12] and later authorizing criminal prosecution for such abuse, the Act was amended in 1991 to create a statutory cause of action that subjects abusers to greater civil liability as a further means to deterring such abuse. (*Covenant Care, supra*, 32 Cal.4th at pp. 779, 784; § 15600, subd. (j); *Intrieri, supra*, 117 Cal.App.4th at p. 82; *Winn, supra*, 63 Cal.4th at p. 155.) As pertinent here, the Act empowers a plaintiff to obtain

---

[11] In light of our standard of review, we need not address plaintiff's disgruntlement over the trial court's criticism of his 45-page, 186-paragraph complaint.

[12] The Act also protects dependent adults, but we limit our discussion of the Act to its protection of elders in light of the focus in plaintiff's complaint on James's status as an "elder."

8

"enhanced remedies"[13]—namely, attorney fees and costs as well as the potential to recover damages for the elder's pre-death pain and suffering—but only if the plaintiff proves (1) that the defendant engaged in "neglect" or "financial abuse," as defined in the Act, and (2) did so with recklessness, oppression, fraud or malice.[14] (§§ 15657 [neglect], 15657.5 [financial abuse]; *Intrieri*, at pp. 82-83; *Delaney*, *supra*, 20 Cal.4th at p. 31; *Winn*, at p. 156.) However, the Act makes clear that these remedies do not extend to a claim "for injury or damage against a health care provider . . . based on the health care provider's alleged professional negligence"; as to such a claim, a plaintiff is relegated to the usual tort remedies. (§ 15657.2; *Winn*, at pp. 159-160; *Delaney*, at p. 30 [noting that traditional remedies for "professional negligence" and the Act's heightened remedies for "abuse and neglect" are "mutually exclusive"].)

As pertinent here, "neglect" under the Act "means . . . [t]he negligent failure of any person having the care or custody of an elder . . . to exercise that degree of care that a reasonable person in a like position would exercise." (§ 15610.57, subd. (a)(1).) By its plain text, this definition has two components—namely, (1) a

13 However, claims under the Act remain subject to the damages limitations in the Medical Injury Compensation Reform Act (MICRA) (Civ. Code, § 3333.2), to the standard for imposing punitive damages (*id*., § 3294, subd. (b)), and to specialized considerations for the reasonableness of attorney fees (§ 15657.1). (§§ 15657, subds. (b) & (c), 15657.5, subds. (c) & (d).)

14 The standard of proof varies: Although a plaintiff must always prove recklessness, oppression, fraud, or malice by clear and convincing evidence, a plaintiff must prove "neglect" by clear and convincing evidence but need only prove "financial abuse" by a preponderance of the evidence. (§§ 15657, 15657.5.)

negligent failure to exercise reasonable care (2) by a person having care or custody of the elder.  The Act enumerates several examples of the first component of neglect, such as the "[f]ailure to assist in personal hygiene, or in the provision of food, clothing, or shelter," the "[f]ailure to provide medical care for physical and mental health needs," the "[f]ailure to protect from health and safety hazards," and the "[f]ailure to prevent malnutrition or dehydration."  (*Id.*, subds. (b)(1), (b)(2), (b)(3) & (b)(4).)  The Act does not define the second, "care or custody" component of neglect, but our Supreme Court in *Winn*, *supra*, 63 Cal.4th 148, held that it requires "a robust caretaking or custodial relationship . . . where [the defendant] has assumed a significant measure of responsibility for attending to one or more of [the] elder's basic needs that an able-bodied and fully competent adult would ordinarily be capable of managing without assistance." (*Winn*, at pp. 157-158; see also *Oroville Hospital v. Superior Court* (2022) 74 Cal.App.5th 382, 404-405 (*Oroville*); *Stewart v. Superior Court* (2017) 16 Cal.App.5th 87, 103 (*Stewart*).)  It is the "substance" of the relationship—and not simply "the defendant's professional standing"—that informs the "nature" of the relationship.  (*Winn*, at pp. 152, 158; *Covenant Care*, *supra*, 32 Cal.4th at p. 785; *Delaney*, *supra*, 20 Cal.4th at p. 34.)  Thus, "circumscribed, intermittent, or episodic," "limited" or "casual" "engagement" or "interaction[]" with an elder does not create the requisite caretaking or custodial relationship.  (*Winn*, at p. 158.)

This care or custody component is critical in delimiting the reach of the Act.  The Act creates civil liability with heightened remedies as a means of "eliminat[ing] . . . the institutional abuse of the elderly in health care facilities" (*Delaney*, *supra*, 20 Cal.4th at pp. 35-36) on the theory that those "heightened remedies"

10

reflect the "heightened risk of harm" to elders who are placed in the care or custody of others (*Winn*, *supra*, 63 Cal.4th at pp. 159-160), but the Act simultaneously expressly *refuses* to extend those heightened remedies to the professional negligence of health care providers (§ 15657.2; see also Code Civ. Proc., § 340.5 [defining "health care provider" to include physician]).  Put differently, the care or custody component is what distinguishes a caretaker's or custodian's "failure to *provide* medical care" (which is actionable under the Act) from the negligent "*undertaking* of medical services" by health care providers (which is *not* actionable under the Act).  (*Covenant Care*, *supra*, 32 Cal.4th at p. 783; *Winn*, at p. 163 ["[N]othing . . . suggests that the Legislature intended the Act to apply *whenever* a doctor treats any elderly patient"]; *Worsham v. O'Connor Hospital* (2014) 226 Cal.App.4th 331, 336 ["The . . . Act does *not* apply to simple or gross negligence by health care providers"].)

"Financial abuse" of an elder under the Act means, in pertinent part, (1) "tak[ing], secret[ing], appropriat[ing], obtain[ing], or retain[ing]," (2) the "real or personal property of an elder," (3) "for a wrongful use or with intent to defraud, or both."  (§ 15610.30, subd. (a)(1).)

### B.  *Analysis*

#### 1.  *Neglect*

Plaintiff has failed to state a claim for "neglect" under the Act against Dr. Etehad because plaintiff has not sufficiently alleged that Dr. Etehad had the requisite "robust caretaking or

11

custodial relationship" with James.[15] (*Winn*, *supra*, 63 Cal.4th at p. 158.)

Although plaintiff alleges that Dr. Etehad "agreed to and did engage in a residential in-facility robust medical caretaking and controlling relationship with James" ~(CT 19 [¶ 29])~, that Dr. Etehad "expressly and impliedly agreed to provide for [James's] professional and custodial medical needs," and that James was "totally dependent on [Casitas Care Center] and [Dr. Etehad] to meet his daily needs," we disregard these allegations because they are legal conclusions (*Winn*, *supra*, 63 Cal.4th at p. 152) and because they are unmoored from any supporting facts as against Dr. Etehad (*Intrieri*, *supra*, 117 Cal.App.4th at p. 82; *Alexander*, *supra*, 23 Cal.App.5th at p. 223).

More to the point, the *facts* plaintiff alleges do not state that Dr. Etehad had a "robust caretaking or custodial relationship" with James. Plaintiff alleges that Dr. Etehad conducted periodic physicals, examinations and evaluations of James's medical condition, and that he did so negligently by conducting only "perfunctory" exams, by not following up on his own orders, by indicating he had examined lab results when he did not, by not noticing or sufficiently addressing James's dehydration or sudden weight loss, and by having poor handwriting. Although there are sufficient facts stating that *Casitas Care Center* had a caretaking or custodial relationship with James (see *Delaney*, *supra*, 20 Cal.4th at p. 34 [a nursing home "perform[s] custodial functions *and* provide[s] professional

---

**15** In light of our conclusion, we have no occasion to reach the parties' further arguments regarding whether plaintiff alleged sufficient facts to state the recklessness element of the neglect claim under the Act.

medical care"]), the allegations establish that *Dr. Etehad*'s relationship with James was episodic and limited. (See *Alexander*, *supra*, 23 Cal.App.5th at p. 223 ["[d]isagreements . . . about the type of care being provided [do] not give rise to an elder abuse cause of action"].)

Our conclusion is consistent with precedent. Although a skilled nursing facility, acute care facility, or hospital can have a robust caretaking or custodial relationship with a patient (e.g., *Stewart*, *supra*, 16 Cal.App.5th at pp. 102-103 [acute care facility that accepts care of patient unable to make decisions has "custody" over dependent adult]; see *Sababin v. Superior Court* (2006) 144 Cal.App.4th 81, 84, 90 [neglect by employees to comply with patient's care plan rendered rehabilitation center liable for neglect]), a health care provider who negligently provides medical services on an outpatient basis or to a patient residing in their own home does not—by virtue of providing negligent medical services alone—assume a robust caretaking and custodial relationship with that patient. (*Winn*, *supra*, 63 Cal.4th at p. 152 [provider of outpatient services did not have "care or custody" of elder]; *Oroville*, *supra*, 74 Cal.App.5th at pp. 388-389 [provider of in-home care did not have "care or custody" of elder]; *Kruthanooch v. Glendale Adventist Medical Center* (2022) 83 Cal.App.5th 1109, 1128-1129 [no substantial evidence of caretaking relationship where provider's interactions were of "limited duration" and "attention to [patient's] basic needs was incidental to the circumscribed medical care . . . provided"].)

Does a physician automatically assume the requisite caretaking or custodial relationship simply because the elderly patient happens to reside in a skilled nursing facility and the

13

physician provides services to patients in that facility?[16]  We conclude the answer is no.  Recognizing such a claim for neglect under the Act without allegations substantiating the necessary substance of the relationship would effectively impute the facility's custodial and caretaking relationship to the physician in contravention of the rule requiring us to evaluate the allegations against each defendant separately.  (*Carter*, *supra*, 198 Cal.App.4th at p. 410 [allegations against one defendant "do not state a cause of action against another defendant against whom the allegations of misconduct are not directed"].)  Recognizing such a claim would also "[b]lur[] the distinction between neglect" that is actionable under the Act (because it involves a caretaker's or custodian's "failure to *provide* medical care") and a health care provider's negligent "*undertaking* of medical services" that is not actionable under the Act.  (*Winn*, *supra*, 63 Cal.4th at p. 160; *Covenant Care*, *supra*, 32 Cal.4th at p. 783; *Alexander*, *supra*, 23 Cal.App.5th at p. 223.)  At most, the allegations here are sufficient to designate Dr. Etehad as a "care custodian" because Dr. Etehad "provid[es] care . . . for elders" as a "member[] of the support staff" of a private facility (§ 15610.17), but *Winn* explicitly holds that this designation is not enough by itself to establish the requisite robust caretaking or custodial relationship.  (*Winn*, at p. 164; see also *Covenant Care*, at p. 786 [claims under the Act "are not brought against health care providers in their capacity as providers but, rather, against custodians and caregivers that abuse elders and that may or may not, incidentally, also be health care providers"].)

---

**16**    The calculus may differ if the physician is involved in the management of the facility, but no such allegations were made here.

14

Plaintiff musters what boil down to two further arguments in favor of his position that Dr. Etehad had a "robust caretaking or custodial relationship" with James sufficient to state a claim under the Act.

First, he argues that *Mack v. Soung* (2000) 80 Cal.App.4th 966 upheld a claim under the Act against a physician who treated an elder at a residential "nursing home." (*Id.* at pp. 969, 973.) *Mack* did so hold, based on the facts of the physician's concealment of the patient's serious condition, refusal to hospitalize the patient when medically necessary, and "abandon[ment of] the patient in her dying hour of need." (*Id.* at p. 973.) Our Supreme Court in *Winn* expressly "disapprove[d] *Mack* . . . to the extent it [found] claims of neglect under the . . . Act may be brought irrespective of a doctor's caretaking or custodial relationship with an elder patient." (*Winn, supra,* 63 Cal.4th at p. 164.) Plaintiff urges that we undertake a nuanced analysis of precisely what *Winn* meant in overruling *Mack* only to a certain "extent." But there is no nuance to plumb: *Mack* presumed that a physician providing medical services at a residential facility was automatically in a caregiving or custodial relationship by virtue of providing those services, and *Winn* held that something more—namely, that the physician has a robust caregiving or custodial relationship with the patient—is required. Plaintiff relatedly notes that *Winn* involved medical services provided on an outpatient basis while this case involves medical services provided at a residential facility, and proclaims that *Winn* "intentionally avoided reaching" the latter situation. Although the factual context of *Winn* and this case are not identical, the *holding* of *Winn* reaffirmed the Act's statutory requirement that a plaintiff show a robust caregiving or custodial

15

relationship has teeth, and this requirement applies regardless of where the elder happens to reside.  (See *Oroville, supra,* 74 Cal.App.5th at p. 404 ["where the services at issue were provided" is not "dispositive"].)  More to the point, we have concluded that the allegations in this case do not satisfy that component of "neglect" under the Act.

Second, plaintiff argues that various federal and state regulations (namely, California Code of Regulations, title 22, sections 72515, 72303, and 72307 as well as 42 Code of Federal Regulations, sections 483.30 and 483.21) necessarily render any physician who renders services to a residential care facility a caregiver or custodian with the meaning of the Act.  Plaintiff relatedly argues that the regulations somehow give rise to a "special relationship" under general principals of tort law (which can often impose a duty to act).  However, as plaintiff admits in his reply brief, the regulations he cites regulate *the facility*, not the physicians who provide medical services for the residents of such a facility.  Thus, they impose no duty and no special relationship.  Plaintiff also cites *Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 590, but that case deals with liability for the infliction of emotional distress.

## 2. *Financial abuse*

Plaintiff has also failed to state a claim for "financial abuse" under the Act against Dr. Etehad.  Plaintiff's theory of financial abuse is that Dr. Etehad's negligently-provided medical services resulted in higher (or unnecessary) charges to Medicare, which may result in higher (or unnecessary) liens by Medicare against any recovery for plaintiff in this case.  If accepted, this theory would mean that any and every instance of a "health care

16

provider's alleged professional negligence" would constitute financial abuse under the Act. This theory of liability is foreclosed as a matter of law by section 15657.2, which, as noted above, explicitly prohibits extension of the Act to claims based solely on professional negligence. We cannot sanction a theory that effects an end-run around a legislatively mandated limitation on the Act.[17]

## II. Did the Trial Court Abuse Its Discretion in Denying Leave to Amend?

A trial court abuses its discretion in denying leave to amend only if there is a "reasonable possibility [that] an amendment . . . would cure the complaint's legal defect[s]." (*Yvanova v. New Century Mortgage Corp.* (2016) 62 Cal.4th 919, 924.) Here, plaintiff does not make any assertion that he could amend his complaint to "cure" the "defect" that renders the claims under the Act barred as a matter of law, and plaintiff admitted to the trial court that he had already included all the facts he had.

## DISPOSITION

The judgment is affirmed. Dr. Etehad is entitled to his costs on appeal.

**CERTIFIED FOR PUBLICATION**.

---

[17] In light of our conclusion, we have no occasion to reach the parties' many arguments regarding standing, the existence of a property interest in Medicare payments and the like.

17

_____, P. J.
HOFFSTADT

We concur:

_____, J.
MOOR

_____, J.
KIM (D.)