Filed 3/14/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| JANICE JARMAN, | |
| Plaintiff and Appellant, | G051086 |
| v. | (Super. Ct. No. RIC10007764) |
| HCR MANORCARE, INC., et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeals from a judgment of the Superior Court of Riverside County, Mac R. Fisher and Phrasel L. Shelton (retired judge of the Riverside Super.Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.), Judges.  Reversed in part and remanded with directions.

Lanzone Morgan, Anthony C. Lanzone, Steffi A. Jose, Anna H. Cronk and Travis K. Siegel for Plaintiff and Appellant.

Petrullo, John Patrick Petrullo and Isaiah Costas; Manatt, Phelps and Phillips, Barry S. Landsburg and Joanna S. McCallum for Defendants and Appellants.

\*          \*          \*

John Jarman (later represented by his daughter, Janice Jarman, as successor in interest), sued HCR ManorCare, Inc., and Manor Care of Hemet, CA, LLC, (we refer to these individually as HCR and Hemet, respectively, and collectively as Manor Care), which own and operate a nursing home facility in Hemet. Jarman, a patient at the facility for three months in 2008, alleged claims for violations of patient's rights pursuant to Health and Safety Code section 1430 (section 1430), elder abuse, and negligence, all arising out of the care he received at the nursing home.

The jury returned a special verdict finding Manor Care committed 382 violations of Jarman's rights, and that its conduct was negligent. The jury awarded Jarman $95,500 in statutory damages (calculated at a rate of $250 for each violation of his rights) plus $100,000 in damages caused by the negligence. The jury also made a finding that Manor Care had acted with malice, oppression or fraud. However, the trial court granted Manor Care's oral motion to strike the punitive damage claim, agreeing with Manor Care that there was insufficient evidence to support the jury's finding of malice, oppression or fraud.

After substantial postverdict wrangling, including an appeal to this court (*Jarman v. HCR Manor Care Inc., et.al.* (April 11, 2014, G049215) [nonpub. opn.] (*Jarman I*)), the trial court entered judgment against Manor Care in the amount of $195,500. The court subsequently awarded Jarman $368,755 in attorney fees.

Jarman appeals from the portion of the judgment denying him punitive damages, arguing the trial court erred by striking the jury's finding Manor Care acted with malice, oppression or fraud. We agree the court erred. The sheer number of violations found by the jury, during the course of Jarman's three-month stay in the Manor Care facility, provides a sufficient basis to infer that Manor Care was acting with a conscious disregard of Jarman's rights and safety during that time. Further, there was evidence the problems were reported to the Director of Nursing, who qualified as a managing agent of the facility for purposes of imposing punitive damages against it.

Manor Care appeals from the judgment as well, challenging it on several grounds. Manor Care first argues the court erred by allowing the jury to award Jarman a separate measure of statutory damages under section 1430 for each of the 382 violations of his rights found by the jury. According to Manor Care, only one award of statutory damages can be made per case under section 1430, in an amount not exceeding $500, no matter how many violations of a patient's rights are proven.

Manor Care also argues the statutory damage award must be reversed in its entirety against HCR, because Jarman did not allege HCR engaged in conduct that violated his rights and because HCR is not a "licensee" subject to liability under section 1430. Manor Care also contends the statutory damage award must be reversed against both HCR and Hemet because the special verdict on the statutory claim made inconsistent references to each of them, and was thus insufficient to support a judgment against either. And Manor Care argues the negligence verdict cannot stand against HCR because the special verdict on negligence omitted any finding of causation against HCR specifically, and that it cannot stand against either HCR or Hemet because the damages awarded were inherently speculative. Finally, Manor Care argues that any reversal of the judgment which favors it will also necessitate a reversal and remand of the attorney fees award.

We are unpersuaded by Manor Care's assertion that Jarman can recover only a single measure of statutory damages under section 1430, no matter how many violations he has proved. We conclude instead that a plaintiff would be entitled to a measure of damages for each *cause of action* asserted under the statute. And because Manor Care made no effort to demonstrate that violations found by the jury in this case added up to fewer causes of action under the statute, we cannot conclude the statutory damages awarded were excessive.

We reject Manor Care's other challenges to the judgment as well. We agree with the trial court that Manor Care waived any challenge to the inconsistencies in

3

the special verdict form. Jarman made it clear his theory was that HCR and Hemet were intertwined for purposes of their potential liability to Jarman, and the record demonstrates that for purposes of trial, they acquiesced in that view. The jury instructions at all times referred to HCR and Hemet as though they were one entity, and their joint counsel made no effort to distinguish between them in his closing argument. Moreover, the two defendants apparently failed to even notice the special verdict form (which their joint counsel drafted) made inconsistent references to them until several months after trial. If this issue was of significance to them during the trial, they should have raised it before the jury was discharged.

And we reject Manor Care's assertion that the damages awarded on Jarman's negligence claim were inherently speculative. Assessing the appropriate amount of damages that would compensate a person who was subjected to the poor treatment and numerous violations of rights the jury found in this case is exactly the type of judgment we rely on juries to exercise.

And having rejected all of Manor Care's challenges to the judgment, we also reject its related claim that the attorney fees and costs award in favor of Jarman must be reversed and remanded for reconsideration. Instead, we remand the case to the trial court with directions to conduct further proceedings to establish the amount of punitive damages Jarman is entitled to recover as a result of Manor Care's 382 violations of his rights.[1]

---

[1] Both sides have requested we take judicial notice of additional documents in connection with this appeal. Jarman has asked us to take judicial notice of a motion for reconsideration that was filed in the trial court and included in his designation of record on appeal, but omitted from the clerk's transcript. The request is granted. Manor Care has requested we take judicial notice of three categories of documents, including (1) legislative history documents related to section 1430; (2) Delaware records pertaining to the corporate status of HCR Manor Care, Inc. and Manor Care of Hemet, LLC; and (3) a document reflecting licensure status of Manor Care of Hemet CA, LLC. We grant the request as to the first category, and deny it as to the second and third. As we have already noted, we conclude Manor Care acquiesced in the view that it should be treated

4

FACTS

Jarman's complaint alleges that when he was admitted to Manor Care's facility, after suffering a broken leg, Manor Care was aware he "required physical assistance with his activities of daily living, including bed mobility, transferring, locomotion, dressing, eating, toilet use, hygiene, and bathing." However, Manor Care allegedly failed to provide him with that required assistance. Instead, he was frequently left lying in soiled diapers, call lights were ignored, and he suffered other abuse and neglect. Moreover, Manor Care knew he was "a high risk for skin breakdown," yet failed to take measures to prevent it, causing him develop "significant skin excoriation and breakdown on his buttocks."

The complaint's first cause of action is based on section 1430, which allows any current or former patient of a skilled nursing facility to pursue a private right of action against a facility that "violates any rights of the resident or patient as set forth in the Patients Bill of Rights in Section 72527 of Title 22 of the California Code of Regulations, or any other right provided for by federal or state law or regulation." (§ 1430, subd. (b).) The complaint alleged state and federal regulations require facilities to: (1) have sufficient nursing staff to provide for "the highest practicable physical, mental, and psychological well being of each resident"; (2) ensure residents "remain free from physical and mental abuse"; and (3) treat residents "with consideration, respect, and full recognition of dignity in care of personal needs."

The complaint's second and third causes of action incorporated the same factual allegations of regulatory violations and neglect, and alleged they amounted to both elder abuse and negligence. As to the former, the complaint alleged Manor Care engaged in a pattern of willful rules violations, with conscious disregard of the health,

as one entity for purposes of this case.

safety and welfare of its patients, and that such mistreatment constituted "abuse of an elder or dependent adult" as defined in Welfare and Institutions Code section 15610.07. As to the latter, the complaint alleged that violation of the statutory and regulatory duties imposed by federal and state law constituted negligence, per se, and that "[a]s a result of this neglect of [Jarman's] needs, [he] sustained severe physical and mental injury including multiple decubitus ulcers and skin excoriations that took approximately one year to heal after being discharged from Manor Care.

The complaint sought both compensatory and punitive damages, as well as relief pursuant to the Patient's Bill of Rights.

Trial commenced in June, 2011. By that time, Jarman was deceased and his daughter, Janice, was substituted as plaintiff in her capacity as his successor in interest. Jarman called several witnesses, including both employees and other former patients of Manor Care, to establish the level of care provided a the Hemet facility, and Jarman's family members testified about the care he received. Jarman also called expert witnesses to opine on nursing standards of care and the types of skin breakdowns that can be suffered by patients in skilled nursing facilities.

Manor Care submitted a proposed special verdict form, and Jarman objected to it on several bases, including its omission of specific findings relating to violations of the Patient's Bill of Rights, and its improper attempt to separate the Manor Care defendants for purposes of liability. Jarman claimed that all of the evidence presented in the case indicated there was no meaningful basis to distinguish between the actions and potential liability of Hemet and HCR.

After the close of evidence, Manor Care moved to strike Jarman's punitive damage allegation, arguing the evidence had been insufficient as a matter of law to support a finding in Jarman's favor on the issue. The court initially granted that motion, but the next day it granted Jarman's motion to reconsider, and reversed that decision. Consequently, the court directed that Manor Care's proposed special verdict form be

6

quickly revised to allow the jury to also answer the question "Did the defendant engage in conduct that caused harm to the plaintiff with malice, oppression or fraud?" Jarman pointed out that Manor Care's proposed verdict form was also deficient in that it did not "provide for a spot for the jury to issue an amount of damages related to the violation of patient's bill of rights claims." The court agreed, and over Manor Care's objection, directed that "defendant's special verdict form" be modified to include it.

However, the special verdict form submitted to the jury was inconsistently worded. It asked the jury to decide if "Manor Care of Hemet" violated Jarman's rights, and if the jury found it had, to state how many times "Manor Care of Hemet" had done so. But it then asked the jury to state the amount it found "HCR Manor Care" to be liable for those violations. With respect to the negligence issue, it asked the jury to separately assess whether "Manor Care of Hemet" and "HCR Manor Care" had been negligent but then simply asked, as to each defendant, whether "Manor Care of Hemet's negligence" was "a substantial factor in causing injury to . . . Jarman." There was no parallel question regarding the negligence of "HCR Manor Care." And although the special verdict form otherwise referred to the parties by name (albeit inconsistently in the case of Manor Care), the final question posed to the jury was simply phased as whether "the defendant engage[d] in conduct that caused harm to the plaintiff with malice, oppression or fraud[.]"

Neither Jarman nor Manor Care drew any formal distinctions between Hemet and HCR in closing argument. Instead, Jarman's counsel referred to the nursing home as the "facility" and to those in charge of running it as "HCR ManorCare" – e.g., "HCR ManorCare was aware that Mr. Jarman needed assistance with his activities of daily living," and "you've also heard an explanation from HCR ManorCare . . . ." And Manor Care's counsel consistently referred to the two defendants, collectively, as "ManorCare" – e.g., "You've heard from the ManorCare nursing and rehabilitation staff over the last couple of days that during the time Mr. Jarman was at ManorCare . . . ," and

7

"this case has never been about whether anyone at ManorCare ever neglected, abused or in any way harmed Mr. Jarman."

The jury found in favor of Jarman and against Manor Care on all issues submitted to it. The jury concluded Manor Care had committed 382 violations of Jarman's rights during his three months as a patient in its facility. The jury was instructed it could award up to $500 for each violation of Jarman's rights, and it awarded $250 per violation for a total of $95,500. The jury also found Jarman had suffered injury as a result of Manor Care's negligence, and awarded him an additional $100,000 in damages for that injury. Finally, the jury found that Manor Care had acted with malice, oppression or fraud in the conduct causing harm to Jarman, a prerequisite to awarding punitive damages, but it was not asked to render a decision specifying an amount of punitive damages at that time.

Immediately following the jury's verdict, Manor Care moved orally for (1) an order striking Janice's claim for punitive damages on the ground there was insufficient evidence to support the jury's determination that Manor Care had acted with malice oppression or fraud, and (2) for a partial judgment notwithstanding the verdict (JNOV) on the ground the jury's determination that Jarman's rights were violated was likewise unsupported by sufficient evidence. The trial court immediately granted the motion to strike Janice's punitive damage claim, but stated it would listen to arguments on the other issue the following day.

After various continuances, as detailed in *Jarman I*, the trial court denied Manor Care's motion for partial JNOV for lack of jurisdiction, and then subsequently concluded the special verdict returned by the jury had been "incomplete and misleading" and announced it was granting Manor Care a new trial "on all issues," on its own motion. (*Jarman I*, *supra*, G049215.) Following an appeal from Manor Care as to the first ruling, and an appeal from Jarman as to the second ruling, we affirmed the denial of the JNOV,

8

reversed the order granting a new trial, and remanded the case to the trial court with directions to enter a judgment on the verdict. (*Ibid.*)

The judgment was entered in September of 2014. It reflected a judgment in favor of Jarman, and against both Hemet and HCR, in the amount of $195,500. It also reflected Jarman was entitled to recover attorney fees and costs, in amounts "to be determined by motion." The court subsequently awarded Jarman $368,775 in attorney fees.

Manor Care filed various challenges to the judgment in the trial court, without success. The trial court concluded Manor Care had waived its objections to the special verdict form.

II

DISCUSSION

*1. Order Striking Jury's Finding of Malice, Oppression or Fraud*

Jarman's sole contention on appeal is that the trial court erred by striking the jury's finding that Manor Care acted with "malice, oppression or fraud" in the conduct that caused him harm. As we stated in *Jarman I*, this order "would more accurately be characterized as an order granting a partial JNOV, as it followed the jury's verdict." (*Jarman I*, *supra*, G049215.)

"'A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support. [Citation.] [¶] . . . As in the trial court, the standard of review [on appeal] is whether any substantial evidence – contradicted or uncontradicted – supports the jury's conclusion.'" (*Cabral v. Ralphs Grocery Co.* (2011) 51 Cal.4th 764, 770.)

Jarman had sought the finding that Manor Care acted with malice, oppression or fraud to support both an award of punitive damages under Civil Code section 3294, and an award of statutory enhanced remedies authorized by Welfare and

9

Institutions Code section 15657 in certain cases of elder abuse. As explained in *Covenant Care, Inc. v. Superior Court* (2004) 32 Cal.4th 771, 779-780, the latter statute allows "a plaintiff who proves 'by clear and convincing evidence' that a defendant is liable for physical abuse, neglect, or financial abuse (as these terms are defined in the Act), and that the defendant has been guilty of 'recklessness, oppression, fraud, or malice' in the commission of such abuse, [to] recover attorney fees and costs. [Citations.] On the same conditions, a plaintiff who brings suit as the personal representative of a deceased elder is partially relieved of the limitation on damages in a decedent's action . . . and thus may recover damages up to $250,000 for emotional distress suffered by the decedent prior to death."

Jarman claims the court erred by striking the jury's finding of malice, oppression or fraud because the record is replete with evidence Manor Care was aware of its patients' rights, and nonetheless engaged in repeated violations of those rights that affected numerous patients, including Jarman. He compares the evidence in this case to the facts deemed sufficient in other cases to justify enhanced remedies under Welfare and Institutions Code section 15657 (See, e.g., *Delaney v. Baker* (1999) 20 Cal.4th 23, *Sababin v. Superior Court* (2006) 144 Cal.App.4th 81; *Mack v. Soung* (2000) 80 Cal.App.4th 966, disapproved on other grounds in *Winn v. Pioneer Medical Group, Inc.* (2016) 63 Cal.4th 148, 163-164),[2] and argues the evidence here is sufficient to demonstrate a similar level of wrongdoing.

Manor Care responds with several arguments, including that (1) the special verdict does not contain findings on any cause of action that would support punitive

---

[2] In both *Covenant Care v. Superior Court*, *supra*, 32 Cal.4th 771, and *Country Villa Claremont Healthcare Center, Inc. v. Superior Court* (2004) 120 Cal.App.4th 426, the courts were merely assessing whether the Code of Civil Procedure section 425.13 prefiling requirement was applicable to claims for punitive damages in elder abuse cases. Consequently, the sufficiency of the alleged wrongs were not considered.

10

damages, (2) the evidence is insufficient to demonstrate Manor Care employees engaged in any misconduct beyond recklessness, and (3) the jury made no finding that any "officer, director, or managing agent" of Manor Care either engaged in malice, oppression or fraud, or ratified such conduct by its employees.

Manor Care's first argument assumes punitive damages are not available on a cause of action alleging violations of section 1430, subdivision (b), because "[w]here a statute creates new rights and obligations not previously existing in the common law, the express statutory remedy is deemed to be the exclusive remedy available for statutory violations, unless it is inadequate." (*De Anza Santa Cruz Mobile Estates Homeowner's Assn. v. De Anza Santa Cruz Mobile Estates* (2001) 94 Cal.App.4th 890, 912.) However, we disagree for two reasons. First, section 1430, subdivision (b), does not create new rights and obligations. It merely authorizes a private enforcement remedy for violations of obligations established by other laws and regulations. And second, the statute explicitly states the remedies it provides are not exclusive. (§ 1430, subd. (c) ["The remedies specified in this section shall be in addition to any other remedy provided by law"].)

Instead, as explained in *Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 215, the general rule is that punitive damages can be recovered on a cause of action for breach of a statutory duty: "[A]s in other actions 'for the breach of an obligation not arising from contract,' punitive damages may be recovered 'where the defendant has been guilty of oppression, fraud, or malice. . . .'" Thus, "[w]hen a statute recognizes a cause of action for violation of a right, all forms of relief granted to civil litigants generally, including appropriate punitive damages, are available unless a contrary legislative intent appears." (*Ibid.*)

Manor Care's reliance on *Myers Building Industries, Ltd. v. Interface Technology, Inc*. (1993) 13 Cal.App.4th 949, is misplaced. In *Myers*, the jury returned a special verdict finding that the defendant had *breached its contract* with the plaintiff, and

11

in doing so had acted with malice, oppression or fraud.  The appellate court concluded that verdict was insufficient to support an award of punitive damages because such an award can only be made in actions for the breach of an obligation *not arising from contract*.  And even though the jury had been instructed on fraud, and the evidence was sufficient to support a fraud verdict, the jury's failure to return a verdict of fraud, or other tort, meant an award of punitive damages was not available.  In this case, by contrast, the jury returned a verdict for breach of an obligation arising *from statute*, not contract.  Thus, punitive damages were available on a showing of oppression, fraud, or malice.

Moreover, such punitive damages can be recovered in addition to statutory damages, as long as the statutory damages are not intended to serve the same purpose as the award of punitive damages.  Thus, in *Greenberg v. Western Turf Assn.* (1903) 140 Cal. 357, the Supreme Court concluded the plaintiff could recover both a statutory penalty of $100 and punitive damages under Civil Code section 3294, when the defendant's violation of the statute was oppressive or violent.  As the court explained, "This [$100] sum is unquestionably a penalty . . . but it will be noted that it is a penalty imposed in any and in every case, whether the [violation] was or was not done under circumstances of oppression or violence. . . .  Moreover, while the law has seen fit to declare that it shall be paid to the complaining party, it might as well have directed that it be paid into the common-school fund.  The imposition is in its nature penal, having regard only to the fact that the law has been violated and its majesty outraged.  It is a matter aside and apart from any consideration of the plaintiff's feelings.  It does not, therefore, exclude the operation of section 3294 of the Civil Code, but that section runs current with it, and, notwithstanding the imposition of the [$100] penalty, in any proper case a plaintiff may recover damages, given by way of example for the personal indignity and wrong which have been put upon him." (*Greenberg v. Western Turf Assn.*, *supra*, 140 Cal. at p. 364; compare *Marshall v. Brown* (1983) 141 Cal.App.3d 408, 419 [requiring the plaintiff to elect between an award of punitive damages and the trebling of

12

compensatory damages provided for in the statute because "'[t]he primary purpose of punitive damages is to punish the defendant and make an example of him.' [Citation.] Since this purpose is the same as the treble damages authorized by Labor Code section 1054, we do not sanction a double recovery for the plaintiff"].)

In this case, as in *Greenberg*, there is no indication the statutory liability imposed by section 1430 is intended to serve the purpose of punitive damages. It is imposed automatically (although the amount may vary up to $500), and without regard to whether the defendant acted willfully or maliciously in violating the patient's rights, or whether the patient's personal dignity was harmed by the violation. We therefore conclude an award of punitive damages under Civil Code section 3294 may be made in connection with a cause of action under section 1430, upon a showing that the defendant's violations of the patient's rights were committed with malice, oppression or fraud.

Manor Care next argues that the evidence cited by Jarman in support of the jury's finding of malice, oppression or fraud, would demonstrate "at most, recklessness." The argument is grounded on the notion that "conscious disregard" of the rights or safety of another is consistent only with a finding of recklessness, and would be insufficient to support a finding of malice. We disagree. Civil Code section 3294, subdivision (c)(1), specifically defines malice as "conduct which is intended by the defendant to cause injury to the plaintiff *or despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others*." (Italics added.) Moreover, "oppression" is defined in the same subdivision as "despicable conduct that subjects a person to cruel and unjust hardship *in conscious disregard of that person's rights*." (Civ. Code, § 3294, subd. (c)(2), italics added.) Thus, the defendant's conscious disregard of the plaintiff's rights or safety will be sufficient to support a finding of malice or oppression, as long as the conduct is also deemed to be despicable. (*College Hospital, Inc. v. Superior Court* (1994) 8 Cal.4th 704, 725; see *Taylor v. Superior Court* (1979) 24

13

Cal.3d. 890, 895-896 ["a conscious disregard of the safety of others may constitute malice within the meaning of section 3294 of the Civil Code. In order to justify an award of punitive damages on this basis, the plaintiff must establish that the defendant was aware of the probable dangerous consequences of his conduct, and that he wilfully and deliberately failed to avoid those consequences"].)

In our view, the jury's finding that Manor Care committed a combined 382 violations of Jarman's rights protected by state and federal law, during the course of his three-month stay at Manor Care's facility, would support not only a finding that its conduct was "despicable," but also a finding that Jarman was subjected to "cruel and unjust hardship." Thus, in that factual context, we reject Manor Care's assertion that a showing it acted in "conscious disregard" of Jarman's rights and safety would be consistent only with a finding of recklessness.[3]

Manor Care's third argument fares no better. Manor Care argues that Jarman's punitive damage claim necessarily fails because there was no finding that Manor Care *itself*, as opposed to its employees, engaged in conduct with malice, oppression or fraud. Specifically, Manor Care points out that Civil Code section 3294 precludes an award of punitive damages against an employer based on employee conduct unless the employer "had advance knowledge of the unfitness of the employee and employed him or her with conscious disregard of the rights or safety of others or authorized or ratified the wrongful conduct . . . or was personally guilty of oppression, fraud, or malice." (Civ. Code, § 3294, subd. (b).) And in the case of a corporate

---

[3] We also reject Manor Care's claim that the jury's decision to award only $250 per violation, rather than a full $500, suggests it did not view Manor Care's conduct as particularly egregious. A finding of 382 violations, in a period of three months, would seem to imply egregious conduct, even if the individual violations were not the worst the jury could contemplate – just as the issuance of 382 citations to a single motorist for moving violations within a three month period would suggest that motorist was a menace to other drivers on the road, even if none of those individual citations had been issued for the most serious violations, such as drunk driving.

14

employer, no such damages can be awarded unless "the advance knowledge and conscious disregard, authorization, ratification or act of oppression, fraud, or malice [was] *on the part of an officer, director, or managing agent of the corporation*." (Civ. Code, § 3294, subd. (b), italics added.)

To be clear, Jarman's assertion that Manor Care acted with malice or oppression was not based on the actions of any specific employee who acted with malice or oppression on a particular occasion, nor was it based on the assertion Manor Care had knowledge that one or more of its employees was unfit. Instead, Jarman's argument was that the facility's consistent and repeated violations of patient rights reflected the Manor Care's *own* conscious disregard of the rights and safety of its patients, including Jarman. Thus, the lack of any specific finding that Manor Care knew that one or more of its employees was unfit, or the lack of any evidence to support such a finding, is immaterial.

Moreover, the lack of a specific jury finding that Manor Care's "oppression, fraud or malice [was] on the part of an officer, director or managing agent" (Civ. Code, § 3294, subd. (b)) does not trouble us. A special verdict requires only findings on "ultimate facts" (*Falls v. Superior Court* (1987) 194 Cal.App.3d 851, 854), and the specific finding would be arguably encompassed in the jury's more general finding that Manor Care itself acted with "malice, oppression or fraud." If Manor Care wished to have the jury give a more detailed breakdown of that general finding, it could have requested one. [4]

Ultimately, Manor Care's argument boils down to a contention that Jarman offered insufficient evidence to support a finding that any of its officers, directors or managing agents knew of his mistreatment or ratified the misconduct of the Manor Care

---

[4] Manor Care also contends the jury's finding on punitive damages is hopelessly vague because it does not designate which Manor Care entity that finding applies to. As we explain, *infra*, Manor Care has waived any arguments relying on the corporate separateness of the two entities.

15

employees.  We would agree there is no evidence that any corporate officer or director was aware of the specific events proved in this case.

Further, as explained in *White v. Ultramar, Inc.* (1999) 21 Cal.4th 563, 576-577, the term "managing agent" in Civil Code section 3294, subdivision (b), does not refer to just anyone with a managerial or supervisory title.  Instead, whether an employee would qualify as a managing agent will depend on "the extent to which [the employee] exercise[s] substantial discretionary authority over decisions that ultimately determine corporate policy.  Thus, *[i]n order to demonstrate that an employee is a true managing agent under section 3294, subdivision (b), a plaintiff seeking punitive damages would have to show that the employee exercised substantial discretionary authority over significant aspects of a corporation's business*." (*White v. Ultramar, Inc.*, *supra*, 21 Cal.4th at pp. 576-577, italics added.)

But while that rule establishes a fairly high bar, we conclude Jarman's evidence was sufficient to clear it.  Jarman introduced evidence that both the facility's Director of Nursing and its Administrator were made aware of the misconduct alleged in this case.  Further, the Director of Nursing testified that the handbook given to patients instructed them that "resident may lodge complaints without fear of reprisal by contacting the center social worker *or any department head*." (Italics added.)  That "department head" designation would include her, and it supports the inference that she was a person authorized by the facility to resolve patient complaints.

Additionally, the Director of Nursing acknowledged that Manor Care's employee handbook specifies "Supervisors have *direct responsibility to see the company goals such as quality care*, customer service and positive employee relations *are met*." That provision is consistent with title 22 California Code of Regulations section 72327, subdivision (c), which regulates nursing facilities such as Manor Care, and requires that "[t]he director of nursing service shall have, in writing, *administrative authority, responsibility and accountability for the nursing services within the facility* and serve

16

only one facility in this capacity at any one time." Given that both Manor Care's own handbook and the applicable regulation require that the Director of Nursing have direct responsibility for ensuring patient care within the facility, we have no trouble concluding she qualifies as a managing agent for purposes of establishing Manor Care's liability for punitive damages in this case.

Consequently, because there was sufficient evidence to support the jury's finding in favor of Jarman on the issue of punitive damages, we conclude the trial court erred by granting Manor Care's postverdict motion for a partial JNOV on this claim.

*2. Statutory Damages Under Section 1430*

Manor Care's first argument is that the provision in the judgment awarding Jarman $95,500 in statutory damages under section 1430, subdivision (b), must be reversed because that provision authorizes a maximum of $500 in statutory damages *per lawsuit*, without regard to how many violations of a patient's rights are proved in that lawsuit.

Section 1430, subdivision (b), states in pertinent part: "A current or former resident or patient of a skilled nursing facility, as defined in subdivision (c) of Section 1250, or intermediate care facility, as defined in subdivision (d) of Section 1250, *may bring a civil action against the licensee of a facility who violates any rights of the resident or patient as set forth in the Patients Bill of Rights* in Section 72527 of Title 22 of the California Code of Regulations, *or any other right provided for by federal or state law or regulation*. The suit shall be brought in a court of competent jurisdiction. The licensee shall be liable for the acts of the licensee's employees. *The licensee shall be liable for up to five hundred dollars ($500), and for costs and attorney fees, and may be enjoined from permitting the violation to continue*." (Italics added.)

17

Because Manor Care's argument involves the interpretation of a statute, a question of law, we review the issue de novo. (*Goodman v. Lozano* (2010) 47 Cal.4th 1327, 1332.)

There are two published cases, *Lemaire v. Covenant Care California, LLC* (2015) 234 Cal.App.4th 860 (*Lemaire*), and *Nevarrez v. San Marino Skilled Nursing & Wellness Centre, LLC* (2013) 221 Cal.App.4th 102 (*Nevarrez*), that address the issue of whether the $500 in statutory damages is to be applied per lawsuit, or per violation. Both cases – *Lemaire* follows *Nevarrez* without significant additional analysis – conclude statutory damages under section 1430 are limited to $500 per lawsuit. However, as we shall explain, we cannot agree that a "per lawsuit" limitation is appropriate.

Before turning to the merits of *Nevarrez*, (and by extension, *Lemaire*) Jarman first argues we should disregard them because they were not decided until after the trial in this case, and thus the jury's verdict "did not run afoul of any appellate court cases." He points out that courts can refuse to follow "doctrine where, after trial, there is a change in judicially declared law that validates a theory that would have been rejected if presented under the case law as it existed at the time of trial." He misunderstands the rule he cites. The rule, as described in *In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1127 (*Moschetta*), is an exception to the general rule that appellate courts *will not consider new issues raised for the first time on appeal*. Thus, *Moschetta* states, including the bracketed phrase, that "'A court may refuse to follow the doctrine [of not hearing new arguments on appeal] where, after trial, there is a change in judicially declared law which validates a theory that would have been rejected if presented under the case law as it existed at the time of trial.'" (*Id.* at p. 1127, fn.12.) The point of that

18

rule is make clear that courts *can consider* new points raised for the first time on appeal, when the law has changed since trial.  That is this case.[5]

Jarman also argues that *Nevarrez* is wrong on the merits, pointing out that an interpretation of section 1430, subdivision (b), which limits damages to $500 per lawsuit would be inconsistent with the statute's goal of protecting nursing home residents because it fails to provide them with any meaningful remedy.  We agree with the point. A statute which offers the opportunity to file a lawsuit for a maximum recovery of $500 – no matter how many wrongs are proved – would be a remedy suitable only for those who like litigating far more than they like money.

*Nevarrez* itself acknowledges that point, but reasons the more significant remedy afforded by section 1430, subdivision (b), is the potential to obtain an injunction, as well as the right to recover attorney fees – noting the latter might be substantial if an injunction were issued.  As *Nevarrez* explains:  "the argument that the $500 statutory maximum must be applied on a 'per violation' basis in order to make private enforcement feasible does not withstand scrutiny.  In the case of a single violation, the 'per violation' approach would make no difference since the patient would recover only $500.  On the other hand, cases of repeated or widespread violations would normally qualify for injunctive relief, the classic remedy to prevent future violations, with monetary and coercive sanctions for contempt.  [Citations.]  Such cases may generate substantial attorney fee awards irrespective of the amount the patient actually recovers since that

---

[5]     Jarman also purports to "adopt[] and incorporate[] the arguments set forth in Amicus Curie Brief in Support of Respondent in *Nevarrez*."  It is improper to do so and we cannot consider those arguments.  (*Soukup v. Law Offices of Herbert Hafif* (2006) 39 Cal.4th 260, 294, fn. 20 ["the Court of Appeal does not permit incorporation by reference of documents filed in the trial court.  [Citations.]  The same principle bars defendants' attempts to incorporate by reference arguments advanced in other appellate briefs.  We therefore disregard these purported incorporations by reference"].)

19

amount would be only one factor in determining the reasonableness of the attorney fee award." (*Nevarrez, supra*, 221 Cal.App.4th at p. 135.)

However, the problem with that analysis is that the opportunity to seek an injunction under section 1430, subdivision (b), seems largely a chimera. Injunctions can be sought only by people who can show a likelihood they will suffer harm *in the future*. (*Blumhorst v. Jewish Family Services of Los Angeles* (2005) 126 Cal.App.4th 993, 1004 ["[F]or standing to seek the prospective relief of an injunction, a plaintiff must show a likelihood he will be harmed in the future if the injunction is not granted"].)[6] And nursing and rehabilitative care facilities are not prisons. If a resident or patient of such a facility felt aggrieved enough to pursue a lawsuit, we think it unlikely the person would voluntarily remain at that facility – and we could not endorse a rule that effectively required him or her to do so as a condition of obtaining meaningful statutory relief.

Moreover, *Scripps Health v. Marin* (1999) 72 Cal.App.4th 324, the case *Nevarrez* cites in support of its analysis of the injunction remedy, does not suggest otherwise. In that case, the appellate court *reversed* an injunction issued by the trial court, on the basis there was no evidence the defendant would commit further objectionable acts against the plaintiff's employees, noting "the express codified purpose of a prohibitory injunction is to prevent future harm to the applicant by ordering the defendant to refrain from doing a particular act." (*Id.* at p. 332.)

More significantly, we must also disagree with *Nevarrez's* conclusion that the language of section 1430, subdivision (b), reflects the Legislature's intention to award

---

[6]   Moreover, there is nothing in section 1430, subdivision (b), that suggests the statutory cause of action is intended to be a representative one, or that the plaintiff should be regarded as acting in the capacity of a private attorney general. (Compare Lab. Code, § 2699.3 [detailing the extensive requirements that must be satisfied before an employee may proceed with a civil suit against an employer under the Labor Private Attorney General Act].) Instead, section 1430, subdivision (b), gives current and former patients and residents of senior care facilities an individual right of action to hold the facilities accountable for wrongs done to them, individually.

damages on a *per lawsuit* basis. The problem, as we see it, is that *Nevarrez* presumes the only options for awarding damages under section 1430, subdivision (b), would be "per violation" and "per lawsuit" – and then supports the "per lawsuit" option largely by focusing on perceived problems with the "per violation" option.

However, as reflected in this court's opinion in *Miller v. Collectors Universe, Inc.* (2008) 159 Cal.App.4th 988 (*Miller*), a third option exists, which is to award statutory damages on a "per *cause of action*" basis. Significantly, *Miller* involves a statute – Civil Code section 3344, subdivision (a) – which is quite similar to section 1430, subdivision (a). It authorizes a private right of action to redress a specific wrongful act – in that case, the misappropriation of another's name, voice, signature, photograph, or likeness for purposes of advertising – and provides for an award of statutory damages (up to $750, as an alternative to actual damages) "in any action brought under this section." (Civ. Code, § 3344, subd. (a).) And just like section 1430, subdivision (b), Civil Code section 3344, subdivision (a), does not specify whether the statutory damages are to be awarded "per violation" or by some other measure.

In *Miller*, the plaintiff proved the defendant had misappropriated his signature on "14,060 certificates opining to the authenticity of various collectible autographs and memorabilia." (*Miller*, *supra*, 159 Cal.App.4th at p. 991.) He argued that showing entitled him to one measure of statutory damages for each certificate; defendant, of course, argued he was entitled to only one measure of statutory damages, no matter how many times it had wrongfully used his signature to authenticate an item. (*Ibid.*)

After first acknowledging the statutory language was ambiguous and both parties' interpretations were plausible (*Miller*, *supra*, 159 Cal.App.4th at p. 1000), this court agreed with the defendant, concluding that under a primary rights analysis, the 14,060 unauthorized signatures constituted a *single cause of action* for statutory damages because they had all violated the single primary right "protected by [Civil Code] section

21

3344(a)'s provision for statutory minimum damages." (*Miller*, *supra*, 159 Cal.App.4th at p. 1006.) And because the plaintiff had stated only one *cause of action* under the statute, he was entitled to only one measure of statutory damages.

Significantly, *Nevarrez* actually discusses *Miller* – but only in the course of rejecting the defendants' assertion that an allegation of multiple violations under section 1430, subdivision (b), would likewise state only a single cause of action under that statute. *Nevarrez* reasoned that because section 1430, subdivision (b), is not "a source of substantive rights, as each provides only a method of enforcing rights 'elsewhere conferred'" and it "imposes liability solely upon the showing a violation of a statute or regulation that comes within its scope. [N]ot all violations will be based on the same facts." (*Nevarrez*, *supra*, 221 Cal.App.4th at p. 137.) Thus, *Nevarrez* found "unpersuasive [the] argument that patients are limited to a single cause of action under section 1430, subdivision (b)." (*Ibid.*)

In our view, *Nevarrez's* acknowledgment that a single plaintiff could state multiple *causes of action* under section 1430, subdivision (b), highlights the flaw in its "per lawsuit" measure of statutory damages. Stated simply, a "lawsuit" has no fixed parameters – it is merely a way of referring to the group of claims or causes of action asserted by the plaintiff(s) in a single case. And while a plaintiff is prohibited from "splitting" a single cause of action between two lawsuits (*Allstate Insurance Co. v. Mel Rapton, Inc.* (2000) 77 Cal.App.4th 901, 906-907), there is no requirement that *separate* causes of action be brought in the *same* lawsuit.

Thus, if the statutory damages available under section 1430, subdivision (b), were allotted on a "per lawsuit" basis as *Nevarrez* concludes is appropriate, a plaintiff claiming multiple violations of the rights it protects could effectively sidestep the $500 limitation by filing multiple lawsuits – one for each *cause of action* alleged under section 1430, subdivision (b). And under that scenario, the amount of statutory damages

22

available to a plaintiff who had suffered multiple wrongs would turn on how that plaintiff chose to *organize* those separate claims in litigation.

If anything, such a rule would discourage efficient litigation tactics without appearing to achieve any other benefit. It would be as though the Legislature had decreed that criminal prosecutors could obtain only one prison sentence for a robbery conviction *per case*, no matter how many separately prosecutable robberies were proved, while leaving them the option of prosecuting each robbery separately. It makes no sense. Consequently, in the absence of affirmative evidence the Legislature intended to establish such an easily manipulated rule – one which also appears to be without precedent – we cannot conclude it did.[7]

By contrast, the "per cause of action" measure of statutory damages applied in *Miller* could not be so easily manipulated – and it otherwise satisfies the concerns which caused *Nevarrez* to reject the "per violation" measure of damages.

For example, *Nevarrez* states it would improper to "read the phrase 'per violation' into section 1430, subdivision (b) since the Legislature did not include it here but did include it in statutes providing for civil penalties in other contexts." (*Nevarrez*, *supra*, 221 Cal.App.4th at p. 130.) But however persuasively that point might argue *against* the inference of a "per violation" measure, it does nothing to establish that a "per

---

[7] As cogently summarized in *Nevarrez*, the legislative history relating to section 1430, subdivision (b), is thin and contains nothing which definitively resolves the issue of how statutory damages were to be measured. However, we note that to the extent the legislative history reflects on the issue at all, it tends to support a "per violation" measure of damages. (See Assem. Com. on Judiciary, Minority Analysis of Sen. Bill No. 1930 (1981–1982 Reg. Sess.) as amended Aug. 2, 1982, p. 1 ["For each violation the patient could recover a maximum of $500 plus attorney fees [and] cost[s]"].) There is nothing that supports a "per lawsuit" measure. Indeed, as *Nevarrez* acknowledges, the only other references to the statutory damage amount in the legislative history merely summarize the statutory language without actually specifying whether the $500 maximum would be awarded per violation, per lawsuit, or on some other basis. (*Nevarrez*, *supra*, 221 Cal.App.4th at p. 133.)

23

lawsuit" measure would be the correct alternative. The very same point could be asserted in support of a "per cause of action" measure.

Similarly, *Nevarrez* concluded that because the operative sentence of section 1430, subdivision (b) – the one setting forth the $500 statutory damage amount – also references the right to recover "costs and attorney fees," it is inconsistent with a "per violation" measure. As the court explained, since costs and attorney fees are "awarded to the prevailing party in a civil action, but not on a 'per violation' basis," it follows that the $500 damage amount would be awarded on the same basis. (*Nevarrez, supra*, 221 Cal.App.4th at p. 131, citing Code Civ. Proc., §§ 1032, subd. (b) ["prevailing party entitled to recover costs in any action"]; 1033.5, subd. (a)(10)(B) ["costs include attorney fees when authorized by statute"].)

But Code of Civil Procedure section 1032, subdivision (b), the costs statute *Nevarrez* relies upon, does not necessarily require that costs be awarded to the prevailing party in the lawsuit as a whole. Instead, it specifies that rule applies "[e]xcept as otherwise expressly provided by statute." (Code Civ. Proc., § 1032, subd. (b).) And because the reference to fees and costs in section 1430, subdivision (b), would seem to qualify as an express provision, we cannot assume it automatically requires adherence to that general rule. Moreover, attorney fees – which are an element of costs – are often awarded based on a party's success on a single *cause of action* affording a right to such fees, rather than on a per lawsuit basis. (*Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129 ["[w]here a cause of action based on the contract providing for attorney's fees is joined with other causes of action beyond the contract, the prevailing party may recover attorney's fees under section 1717 only as they relate to the contract action"]; *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1604 ["[w]here fees are authorized for some causes of action in a complaint but not for others, allocation is a matter within the trial court's discretion"].) Given those considerations, we conclude the

24

reference to fees and costs in section 1430, subdivision (b), would also be consistent with a "per cause of action" measure of recovery.

And finally, *Nevarrez* cites perceived practical and due process problems presented by a rule allowing a plaintiff to recover a separate measure of damages for each and every violation of a right protected under section 1430, subdivision (b): "The 'per violation' approach . . . presents its own problems since that subdivision provides no standard for determining a licensee's liability in the case of continuing violations, such as the understaffing and failure to offer restraints here. The suggestion that section 1430, subdivision (b) should be 'liberally construed' to allow an unlimited monetary recovery because it is not tied to the administrative enforcement scheme raises due process concerns [and might] 'result in an unreasonable or oppressive statutory penalty.'" (*Nevarrez*, *supra*, 221 Cal.App.4th at pp. 135-136.) But awarding damages on a "per cause of action" basis eliminates at least some of those concerns because under a primary rights analysis, the defendant's continuing violation of the same right protected under section 1430, subdivision (b), would presumably qualify as a single cause of action. (*Miller*, *supra*, 159 Cal.App.4th at p. 1006.)

For all of the foregoing reasons, we reject Manor Care's contention that section 1430, subdivision (b), authorizes a maximum of $500 in statutory damages *per lawsuit*, without regard to how many violations of a patient's rights are proved in that lawsuit. We conclude instead that a plaintiff may recover up to $500 per *cause of action* prosecuted under the statute.

And while it is possible Manor Care could have limited the statutory damages in this case by arguing that the number of violations found by the jury in this case amounted to fewer *causes of action*, based on *Miller*, it has made no effort to do so either at trial or on appeal. Although *Miller* was decided in 2008, prior to the trial in this case, Manor Care did not rely on it as a basis for limiting statutory damages at trial, and

25

made no effort at trial to quantify how many causes of action might have been proven under section 1430, subdivision (b).

And on appeal, it is Manor Care's burden to demonstrate that the number of statutory damage awards reflected in the jury's verdict was erroneous. But here again, Manor Care has offered no analysis of the facts underlying the violations found by the jury and has made no arguments as to how many primary rights were affected. Instead, it simply acknowledged that "none" of the violations found by the jury "was identified in the special verdict." For all we know, the 382 violations found by the jury reflect circumstances establishing 382 separate causes of action; and in the absence of an affirmative showing to the contrary, we are obligated to presume they do. (*Denham v. Superior Court* (1970) 2 Cal.3d. 557, 564 ["'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown'"].) Given the focused nature of Manor Care's challenge to the statutory damages awarded, we cannot conclude that award was excessive.

*3. Deficiencies in the Special Verdict*

Manor Care also points to inconsistencies in the way in which it is identified in the special verdict form, and argues those inconsistencies preclude a judgment against either HCR or Hemet individually on the claim for statutory violations, and against HCR on the cause of action for negligence. Specifically, Manor Care contends that because the special verdict states "Manor Care of Hemet" violated Jarman's rights 382 times, but then asks the jury for the total amount it finds "HCR Manor Care" liable for as a result of those violations, the verdict is incomplete as to both HCR and Hemet, and no judgment on that claim could be entered against either of them. Manor Care also contends that no judgment could be entered against HCR on the negligence claim because the special verdict finds, as against both HCR and Hemet, that "Manor

26

Care of Hemet's negligence" was a substantial factor in causing Jarman's injuries, but it makes no such finding with respect to the negligence of "HCR Manor Care." We conclude those arguments, based on the notion that the verdict's references to "Manor Care of Hemet" and "HCR Manor Care" were intended to designate separate corporate entities with distinct liabilities, are unpersuasive.

While a special verdict is risky because "'the possibility of a defective or incomplete special verdict, or possibly no verdict at all, is much greater than with a general verdict that is tested by special findings . . . .'" (*Falls v. Superior Court*, *supra*, 194 Cal.App.3d at pp. 854-855), the right to correct ambiguities in a special verdict can be waived if not raised before the jury is discharged. "'If the verdict is ambiguous the party adversely affected should request a more formal and certain verdict. Then, if the trial judge has any doubts on the subject, he may send the jury out, under proper instructions, to correct the informal or insufficient verdict.'" (*Woodcock v. Fontana Scaffolding & Equip. Co*. (1968) 69 Cal.2d 452, 456.)

And when correction of an ambiguity is not requested in a timely fashion, it is up to the court to interpret the verdict. "[W]here no objection is made before the jury is discharged, it falls to 'the trial judge to interpret the verdict from its language considered in connection with the pleadings, evidence and instructions.' [Citations.] Where the trial judge does not interpret the verdict or interprets it erroneously, an appellate court will interpret the verdict if it is possible to give a correct interpretation." (*Woodcock v. Fontana Scaffolding & Equip. Co*., *supra*, 69 Cal.2d at pp. 456-457.)

Based on the record in this case, our interpretation of the special verdict is that it was not intended to draw distinctions between HCR and Hemet for purposes of liability. From the beginning of the case, Jarman's theory has been that HCR and Hemet acted as one company in operating the Hemet facility. He alleged in his complaint that HCR and Hemet "operated in such a way as to make their individual identities

27

indistinguishable," and that they acted together to "manage[] and/or control[] all aspects of the operation and management of the facility."

At trial, there was substantial evidence admitted to support the conclusion the two defendants operated as one, and that one was simply referred to as "HCR Manor Care." For example, Jarman's admission agreement identified the "facility" not as "Manor Care of Hemet," but as "HCR Manor Care" and employees of the facility testified their employer was "HCR ManorCare."[8] One employee testified, "I worked for ManorCare of Hemet" but then agreed her employer was "HCR ManorCare," while another employee testified she had never heard the facility referred to as anything other than "HCR ManorCare."

In his opening statement, Jarman's counsel referred to the "nursing facility in Hemet," which he explained was "owned and operated by a company called HCR ManorCare Incorporated." He explained that the Hemet facility is one of "hundreds of long-term care facilities in multiple states throughout the United States" owned by HCR ManorCare. That distinction, between the physical facility in Hemet, and the defendant that owned and operated it, is consistent with the special verdict's references to "Manor Care of Hemet" (the facility) and "HCR Manor Care" (the owner and operator).

And despite the fact that Jarman's counsel made clear at trial that he was treating both defendants as one for purposes of liability – even going so far as to object to Manor Care's proposed special verdict on the ground it had sought to separate them – neither HCR nor Hemet disputed that characterization, or made any significant effort to demonstrate the facility was owned or operated by Hemet specifically, rather than by HCR. To the contrary, in both their joint counsel's opening statement and his closing

---

[8] HCR's formal name includes no space between "Manor" and "Care," while Hemet's formal name does contain a space between those words. The reporter's transcript consistently reflects the name "ManorCare," with no space, even when referring to Hemet.

28

argument, he consistently referred to them, apparently collectively, as "ManorCare." Rather than pointing out that the two defendants were distinct entities, or claiming they had potentially separate exposures to Jarman's claims, Manor Care's counsel made no effort to distinguish them from each other.

Similarly, the jury instructions read to the jury consistently referred to the defendants as a though they were a single defendant named "HCR ManorCare," with no objection from either HCR or Hemet.

And finally, it was Manor Care's counsel who prepared the special verdict. It is difficult to believe it could have been drafted with so little attention to distinguishing between HCR and Hemet, if they intended to rely on that distinction as a basis for one or the other of them defeating liability. This is particularly true in light of Jarman's having objected to Manor Care's initial draft of the special verdict on the ground that "[s]eparating out the [d]efendants was improper" in light of the evidence adduced during trial.

And perhaps most tellingly, although Manor Care did attack the verdict in the immediate wake of its rendition, by filing both a motion to correct it and a motion for entry of a partial JNOV, neither motion sought relief on the basis the verdict had failed to adequately differentiate between HCR and Hemet. By Manor Care's own admission, it first raised that issue four months after the verdict was rendered, in response to Jarman's motion for entry of judgment. The fact that neither HCR nor Hemet thought to point out, until four months after the jury was discharged, that the special verdict contained incomplete findings as to each of them, suggests strongly that the discrepancy was not viewed by either of them as significant during the trial. Based upon all of that evidence,

29

we conclude the special verdict was not intended to distinguish between Hemet and HCR for purposes of liability.[9]

Finally, we note that a waiver of defects in a special verdict will be found if it appears the party belatedly asserting the deficiency has engaged in gamesmanship. (*Woodcock v. Fontana Scaffolding & Equip. Co.*, *supra*, 69 Cal.2d at p. 456, fn. 2 [defect in special verdict waived if the failure to object was "the result of a desire to reap a 'technical advantage' or engage in a 'litigious strategy'"].) And if we accepted the premise that HCR and Hemet had actually believed, during the trial, that the jury was required to assess their liability as to each of Jarman's claims independently of each other, we would have to conclude that their failure to point out the insufficiency of this special verdict – which their own counsel drafted – demonstrated gamesmanship. The trial court concluded Manor Care had waived its objections to the special verdict in this case, and we agree.

*4. Damages for Negligence*

Manor Care's last attack on the judgment is its claim that the $100,000 in damages awarded to Jarman on his negligence claim must be rejected on the ground it is "inherently speculative." However, the only case Manor Care relies upon to support that contention is *Piscitelli v. Friedenberg* (2001) 87 Cal.App.4th 953, 989, a case involving an award of *future* damages based on an expert's testimony. The expert had opined that the value of a particular investment account would have increased to $50 million by a particular date. What the court concluded was that *the expert's opinion* was "supposition," because there was no evidence in the record to support it. (*Id.* at p. 990.)

_____

[9] For this same reason, we also reject Manor Care's claim that no judgment could be entered against HCR for violations of Jarman's rights under section 1430 because (1) the cause of action was not alleged against HCR specifically, and (2) HCR was not the "licensee" subject to liability under section 1430.

30

In this case, assessing damages required no particular expertise and no prognostication of future events. The jury was asked to affix compensation for the harm it concluded had already been inflicted upon a person in circumstances any juror could relate to. This is a task we routinely rely on jurors to do, and we do not consider it speculative. "The jury 'is entrusted with vast discretion in determining the amount of damages to be awarded,' and a reviewing court will reverse or reduce the award only ""'where the recovery is so grossly disproportionate as to raise a presumption that it is the result of passion or prejudice . . . .'" [Citations.]'" (*Bender v. County of Los Angeles* (2013) 217 Cal.App.4th 968, 985.) Manor Care makes no claim that the jury's award was so grossly disproportionate as to raise a presumption of passion or prejudice, and consequently we will not disturb it. We consequently reject Manor Care's challenge to the damages awarded for negligence.

III

DISPOSITION

The judgment is reversed in part and the case is remanded to the trial court with directions to conduct further proceedings to establish the amount of punitive damages Jarman is entitled to recover as a result of Manor Care's 382 violations of his rights. In all other respects, the judgment is affirmed. Jarman is to recover his costs on appeal.

MOORE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


IKOLA, J.

31